IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| BROADBASED EQUITIES, ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED, <br><br> PLAINTIFF, <br><br> VS. <br><br> KEITH OLSEN, WILLIAM LUBY, KATHLEEN EARLEY, GEORGE KELLY, ARTHUR MATIN, G. MICHAEL SIEVERT, MICHAEL SILECK, M. ALEX WHITE, SWITCH & DATA FACILITIES COMPANY INC. AND EQUINIX, INC. <br><br> DEFENDANTS. | CIVIL ACTION NO. <br> 8:09-CV-02473-RAL-TBM |

**PLAINTIFF'S EMERGENCY MOTION FOR LIMITED EXPEDITED DEPOSITIONS IN AID OF ITS FORTHCOMING MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

Plaintiff Broadbased Equities respectfully submits this Emergency Motion For Limited Expedited Depositions In Aid of Its Forthcoming Motion for a Preliminary Injunction, and Memorandum of Law in Support thereof.

**I.  STATEMENT PURSUANT TO LOCAL RULE 3.01(A)**

Plaintiff respectfully requests that the Court enter an order requiring defendants Keith Olsen and William Luby (two of the ten defendants) to make themselves available for deposition on an expedited schedule.[1] The basis for the relief requested is that plaintiff will

---

[1] Plaintiff is not asking for document discovery because, pursuant to agreement of the parties, it has already received 758 pages of documents from defendants, including minutes from the

be unduly prejudiced unless it has the opportunity to take these expedited depositions and to have a *post*-deposition motion for a preliminary injunction heard on or before January 29, 2010 (the date defendants intend to consummate the sale of Switch & Data Facilities Company Inc. ("Switch & Data" or the "Company") to Equinix, Inc. ("Equinix")).

## II.   CERTIFICATE PURSUANT TO LOCAL RULE 3.01(G)

This action was filed on December 7, 2009 and served upon defendant Switch & Data and its directors on December 14, 2009 and defendant Equinix Inc. on December 9, 2009. Pursuant to Local Rule 3.01(G), counsel for plaintiff consulted with Neil Potischman of Davis Polk & Wardwell, LLP and Louise McAlpin of Holland & Knight, LLP (collectively counsel for all defendants), on December 29, 2009, and was advised that they oppose the present motion.

Given the time constraints imposed by the January 29, 2010 deadline for the closing of the sale of Switch & Data to Equinix challenged by this action, Plaintiff also respectfully requests that the Court schedule oral argument on the present motion as soon as possible after Thursday, January 7, 2010.

## III.   PRELIMINARY STATEMENT

Plaintiff Broadbased Equities, a shareholder of Switch & Data, which has brought the present action individually asserting violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and the rules and regulations promulgated thereunder, including SEC Regulation 14a-9, 17 C.F.R. 240.14a.9., and as a

---

meetings of Switch & Data's board of directors and presentations provided to the board by its financial advisors.

shareholder class action on behalf of Plaintiff and the other public holders of shares of Switch and Data common stock asserting common law claims at Delaware law, respectfully moves the Court for an order granting expedited depositions of two of the ten defendants so that it may use those depositions to brief and file a motion for a preliminary injunction and have that motion heard on or before the January 29, 2010 date on which defendants have indicated they will consummate the sale of Switch & Data to Equinix.

In this regard, on or about October 22, 2009 Equinix and Switch and Data announced that they have entered an agreement for Equinix to acquire Switch and Data in a transaction valued at approximately $689 million in cash and stock (the "Sale Agreement"). In connection with soliciting shareholders' votes on the Sale Agreement, on or about December 21, 2009, the Individual Defendants (defined in the Complaint as the directors of Switch and Data) caused the Company to file with the SEC a Proxy Statement (the "Proxy Statement") which was also mailed to shareholders on or about December 23, 2009. Plaintiff alleges, *inter alia*, that the Proxy Statement mailed to shareholders violates Delaware common law and the Exchange Act because it contains statements which, at the time and in the light of the circumstances under which they are made, are false or misleading with respect to any material fact, or which omit to state any material fact necessary in order to make the statements therein not false or misleading.

Further, because plaintiff will suffer irreparable harm if it is forced to make a decision as to how to vote in connection with the Sale Agreement on the basis of the current Proxy

Statement and without the benefit of having received all material information,[2] plaintiff intends to move for a preliminary injunction enjoining the consummation of the Sale Agreement.

Finally, because defendants have indicated that they intend to consummate the Sale Agreement as soon as January 29, 2010, plaintiff requires expedited depositions of two of the ten defendants so that it may have a meaningful opportunity to utilize the material obtained during the depositions to prepare and present a motion for a preliminary injunction to the Court that may be heard and ruled upon *prior* to January 29, 2010. Therefore, plaintiff respectfully requests that the Court enter an order requiring defendants Keith Olsen and William Luby to make themselves available for depositions on an expedited schedule.

## IV. STATEMENT OF FACTS

### A. Switch & Data Is Poised to Benefit from Increased Demand For Its Services Which Is Predicted To Grow At A Compound Annual Growth Rate By As Much As 49% By 2012

Switch & Data's most recent annual report on Form 10K, filed with the SEC on or about March 3, 2009 (the "2009 Form 10K"), states as follows with regard to the Company's future prospects:

---

[2] Courts have specifically found that misleading statements in filings sent to shareholders can cause irreparable harm. *See Gilmartin v. Adobe Resources Corp.*, 1992 Del. Ch. LEXIS 80, at *43 (April 6, 1992); *Edudata Corp. v. Scientific Computers, Inc.*, 599 F. Supp. 1084, 1088 (D. Minn. 1984) ("federal and state policy favors adequate disclosure so that shareholders and investors may make informed decisions … [t]he public interest will be furthered by full disclosure of all material information concerning Edudata's tender offer … protect[ing] shareholders and investors by furnishing them with the necessary information required to exercise an informed choice."); *Lichtenberg v. Besicorp Group, Inc.,* 43 F. Supp.2d 376, 391 (S.D.N.Y. 1999) (finding misleading statements in a proxy to cause irreparable harm because "fair corporate sufferance is an important right that should attach to every equity security

> We believe our broad geographic footprint represents a competitive advantage in that we have data centers in 17 of the 20 largest metropolitan service areas in the U.S., which is the broadest of any of our network-neutral competitors.  Our presence in these markets enables us to serve customers in locations where Internet traffic is most concentrated and to serve customers who require a presence in multiple markets. As of December 31, 2008, of our top 100 customers, 80 utilize our services in multiple markets.
>
> Several favorable industry trends are driving demand for our network-neutral interconnection and colocation services. These trends include growth in Internet traffic driven by increasing broadband penetration and a proliferation of broadband intensive applications such as video, gaming, and online music; an increasing need for advanced networking technology provided through reliable and secure infrastructure; the growing trend of outsourcing data center functions to benefit from 24 x 7 support, cost savings, and a skilled workforce; and a growing need of business continuity and disaster recovery services. Each of these trends requires an infrastructure that needs to be housed and connected in physical data centers. ***We believe that our competitive strengths (including our broad network-neutral geographic footprint, our robust data centers and operational excellence, and our engineering and networking expertise) position us well to capitalize on the growing demand for interconnection and colocation services.***

*See* Vianale Declaration, Exhibit 1 at 3.

Also, according to the Company's 2009 Form 10K, third party Cisco predicts consumer Internet traffic and business Internet traffic is predicted to grow at a compound annual growth rate of 49% and 35%, respectively, between 2007 and 2012, which growth increases demand for colocation services, including those provided by the Company. *Id*. at 4.

**B.      Switch & Data Is A Strong Company with Potential For Greater Growth**

Despite the recession plaguing the United States' economy, Switch & Data has experienced strong financial results for the past two years.  Indeed, while many companies

---

bought on a public exchange" and this includes the "right to be free from deceptive proxy

5

were announcing cutbacks and layoffs in connection with the recession, Switch & Data continued to post impressive financial results. For example, in a February 17, 2009 press release (the "2008 Press Release"), Switch & Data announced that for the fourth quarter (the "Q4 2008") and full year ended December 31, 2008, the Company had experienced the following financial growth when compared to the same period for 2007:

- For Q4 2008, a 22% increase in total revenue from $37.5 million to $45.8 million.
- For Q4 2008, a 22% increase in recurring revenue from 2007 to $42.9 million.
- For Q4 2008, a 25% increase in EBITDA operating income from $2.2 million to $2.8 million.
- For the full year for 2008, a 25% increase in total revenue to $171.5 million.
- For the full year for 2008 EBITDA increased 33% to $56.6 million from $42.5 million.

*See* Vianale Declaration, Exhibit 2.

In the 2008 Press Release, defendant Keith Olsen, Switch & Data's President and CEO, stated as follows with regard to the Company's fourth quarter and full year for 2008 results and its future prospects:

> In 2008 we delivered strong revenue and EBITDA growth . . . We continue to balance the counteracting dynamics of economic headwinds and strength in market demand. Our outlook for growth in 2009 is centered on continued strength in demand for our services.

*Id.*

The Company's impressive financial gains have continued into fiscal year 2009. For example, an April 28, 2009 press release (the "Q1 2009 Press Release") announcing the Company's financial results for the first quarter of 2009 ending March 31, 2009 (the "Q1

---

solicitations).

2009") revealed that the Company had experienced the following improvements for the Q1 2009 when compared to the same period for 2008:

- An 18.5% increase in total revenue from $39.8 million to $47 million.
- A 19.2% increase in recurring revenue from 2008 to $44.9 million.
- A 31.7% increase in EBITDA from $12.6 million to $16.6 million.

*See* Vianale Declaration, Exhibit 3.

In the Q1 2009 Press Release, defendant Keith Olsen stated as follows with regard to the Company's Q1 2009 results:

> In the first quarter we delivered strong sequential recurring revenue growth and improved margins supported by continued demand for our services . . . Switch [&] Data posted an overall solid performance.

*Id.*

Further, a July 28, 2009 Press Release (the "Q2 2009 Press Release") announcing the Company's financial results for the second quarter ended June 30, 2009 (the "Q2 2009") revealed that the Company had experienced the following improvements for the Q2 2009 when compared to the same period for 2008:

- For Q2 2009, a 17.8% increase in total revenue from $41.9 million to $49.3 million
- An 18.8% increase in recurring revenue from 2008 to $47 million.
- A 12.7% increase in operating income from $4.3 million to $4.9 million.
- A 32.4% increase in Adjusted EBITDA to $18.7 million from $14.2 million.

*See* Vianale Declaration, Exhibit 4.

In the Q2 2009 Press Release, defendant Keith Olsen stated as follows with regard to the Company's Q2 2009 results:

> Customer demand, improved bookings and increasing margins continues to fuel our business momentum . . . our investments coupled with focused execution resulted in solid second quarter results.

*Id.*

Finally, an October 27, 2009 press release (the "Q3 2009 Press Release") announcing the Company's financial results for the third quarter of 2009 ending September 30, 2009 (the "Q3 2009") revealed that the Company had experienced the following improvements for the Q3 2009 when compared to the same period for 2008:

- A 21.4% increase in total revenue from $44.1 million to $53.5 million.
- A 17.3% increase in recurring revenue from 2008 to $48.8 million.
- A 50.5% increase in Adjusted EBITDA to $21.0 million from $14.0 million.
- A 94.2% increase in operating income from $3.8 million to $7.3 million.

*See* Vianale Declaration, Exhibit 5.

In the Q3 2009 Press Release, defendant Keith Olsen stated as follows with regard to the Company's Q3 2009 results and its potential for growth:

> Business momentum continued in the third quarter . . . Our third quarter results amplify the strength of our operating model and the value we provide to customers. With increasing needs of network centric customers, our broad footprint, carrier densities and access to population centers are key value drivers for our business.

*Id.*

C. **Despite Switch & Data's Demonstrated Potential for Greater Growth, the Individual Defendants Determined to Sell the Company "On-The-Cheap"**

Despite this demonstrated potential for growth, beginning in January 2009, the Individual Defendants began having discussions with a privately-held firm in Switch & Data's industry based outside of the United States (the "International Party") to explore

8

whether a business combination might be feasible. *See* Vianale Declaration, Exhibit 6 at 29. Thereafter, in late April 2009, an Equinix representative indicated an interest in meeting with Switch & Data and at a meeting on May 4, 2009, Stephen M. Smith, the Chief Executive Officer and President of Equinix asked defendant William Luby if Switch & Data would be interested in considering a business combination. *Id.* Defendant William Luby indicated that Switch & Data was not for sale, but that he would discuss the situation with the Switch & Data board of directors and respond to Mr. Smith during the week of May 11, 2009. *Id*.

Thereafter, the Company and/or its representatives held separate discussions with both the International Party and Equinix with regard to a potential business combination. *Id*. at 30-38. Notably, during this time the Individual Defendants' efforts appeared focused on discussions with Equinix and, indeed, the Proxy Statement wholly fails to describe the extent of the negotiations had with the International Party. *Id.* Moreover, notwithstanding that they were in effect negotiating a sale of the Company, the Individual Defendants failed to conduct any market check in order to maximize shareholder value. *Id.*

On October 21, 2009, aware that the Company was about to announce yet another quarter of stellar financial results, the Individual Defendants caused Switch & Data to announce that it had entered into an agreement pursuant to which it would be acquired by an affiliate of Equinix (the "Sale Agreement"). *See* Vianale Declaration at Exhibit 7. Under the terms of the Sale Agreement, Switch & Data stockholders will have the opportunity to elect to receive either 0.19409 shares of Equinix stock or $19.06 in cash for each share of Switch & Data stock. *Id.* The overall consideration to be paid by Equinix in the acquisition will be 80% Equinix stock, 20% cash. *Id.* In addition, a portion of the cash consideration payable to

9

Switch & Data stockholders may be replaced by an equivalent amount of Equinix stock to the extent necessary to enable the transaction to qualify as a tax-free exchange. *Id.* The Sale Agreement is valued at approximately $689 million, based on the closing price of the Company's stock as of October 20, 2009. *Id.*

Notwithstanding their failure to maximize the value of the sale of the Company by negotiating with other potential buyers for the Company, the Individual Defendants caused the Company to agree to the following preclusive deal protection devices which effectively ensure that the Company will be sold to Equinix:

- The **No Solicitation Clause** severely restricts the Company's ability to solicit and/or otherwise engage in discussions with other potential buyers for the Company.

- The **Voting Agreement** which commits the Individual Defendants and their affiliates to vote shares representing 35% of Switch & Data's outstanding shares in favor of the Sale Agreement and against any other proposal to acquire the Company.

- The **Termination Fee** obligates the Company to pay a termination fee of $26,757,615, or approximately 3.9% of the aggregate value of the Sale Agreement, to Equinix in the unlikely event it enters into a superior agreement to be acquired by another entity.

- The **Matching Rights Provisions** affords Equinix the opportunity to "top" any subsequent superior offer for the Company in the unlikely event that occurs.

*See* Vianale Declaration, Exhibit 6 at 9, 73-75, 77.

Notably, the Individual Defendants' actions in causing the Company to enter into the Sale Agreement mere days before the Company announced its financial results for the third quarter of 2009, which demonstrated that the Company had almost doubled its operating income from the prior year, effectively capped the price for the Company and ensured that Equinix would acquire the Company on the cheap.

**D.     The Materially Incomplete and Misleading Proxy Statement**

Despite the fact that Switch & Data shareholders are being asked to make a decision on how to vote with regard to the Sale Agreement, the defendants have filed with the SEC and mailed to shareholders a Proxy Statement which omits material facts. Specifically, the Proxy Statement omits, *inter alia*, the following information (i) information regarding the valuation discussions the Individual Defendants had with the only other party with which they engaged in discussions regarding the sale of the Company (the "International Party"), including the prices discussed; (ii) information regarding the substance of the discussions they had with the International Party; (iii) information regarding a comparative analysis of a potential combination with Equinix and a potential combination with the International Party that the board admits it discussed; and (iv) information regarding the valuation analyses conducted by the Company's financial advisor.

**V.     BASIS FOR THE RELIEF REQUESTED**

The transaction that plaintiff challenges is scheduled to close as soon as January 29, 2010. Plaintiff alleges that it will be unduly prejudiced and is suffering and will continue to suffer irreparable harm if it is forced to make a decision on how to vote with regard to the

Sale Agreement without the benefit of having received all material information. Therefore, plaintiff has a pressing need to conduct limited expedited depositions so that it will have an adequate opportunity to prepare for and present a motion for a preliminary injunction enjoining the consummation of the Sale Agreement prior to January 29, 2010. *See Gilmartin v. Adobe Resources Corp.*, 1992 Del. Ch. LEXIS 80, at *43 (April 6, 1992) ("The right to cast an informed vote is specific, and its proper vindication in this case requires a specific remedy such as an injunction, rather than a substitutionary remedy such as damages."); *Edudata Corp. v. Scientific Computers, Inc.*, 599 F. Supp. 1084, 1088 (D. Minn. 1984) ("federal and state policy favors adequate disclosure so that shareholders and investors may make informed decisions … [t]he public interest will be furthered by full disclosure of all material information concerning Edudata's tender offer … protect[ing] shareholders and investors by furnishing them with the necessary information required to exercise an informed choice."); *Lichtenberg v. Besicorp Group, Inc.,* 43 F. Supp.2d 376, 391 (S.D.N.Y. 1999) (finding misleading statements in a proxy to cause irreparable harm because "fair corporate sufferance is an important right that should attach to every equity security bought on a public exchange" and this includes the "right to be free from deceptive proxy solicitations").

## VI.    LEGAL ARGUMENT

### A.    This Court Has The Power To Order Expedited Depositions

This Court has broad discretion to control discovery. *See e.g., Klay v. All Defendants*, 425 F.3d 977, 982 (11th Cir. 2005) ("A district court is entitled to broad discretion in managing pretrial discovery matters") (internal citations omitted); Fed. R. Civ. P. 26(b)(c).

While Federal Rule of Civil Procedure 26(f) provides that a party may not seek discovery from any source before the parties have conferred, Rule 26(d) allows that, upon motion, for the convenience of the parties and witnesses and in the interest of justice, the Court may grant leave to conduct discovery prior to the Rule 26(f) conference. Rule 30 also provides that the court may allow a plaintiff "to take a deposition before the time specified in Rule 26(d)." *See also Integra Bank N.A. v. Pearlman*, 2007 U.S. Dist. LEXIS 7781 (M.D. Fla. Feb 2, 2007) ("The Federal Rules of Civil Procedure relating to discovery in federal court proceedings expressly provide that a Court may shorten the time for a party to provide discovery.")

Further, Courts recognize that "expedited discovery should be granted when some unusual circumstances or conditions exist that would likely prejudice the party if he were required to wait the normal time." *Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Helio Import/Export, Inc.*, 601 F. Supp. 1, 3 (S.D. Fla. 1983); *Fimab-Finanziaria Maglificio Biellese Fratelli FILA S.p.A. v. Kitchen*, 548 F. Supp. 248, 250 (S.D. Fla. 1982) (same); *Semitool, Inc. v. Tokyo Electron America, Inc.*, 208 F.R.D. 273, 275 (N.D. Cal. 2002) (same).

Such a case arises where, as here, a party seeks temporary injunctive relief to avoid irreparable harm. *See Yokohama Tire Corp. v. Dealers Tire Supply, Inc.*, 202 F.R.D. 612, 613 (D. Ariz. 2001) ("expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings."); *Int'l Beauty Exch., Inc. v. Tony Dollar Kingdom, Inc.*, 199 F.R.D. 700, 701 (S.D. Fla 2001) (expedited discovery and a temporary restraining order granted in prior proceeding); *Qantum Communs.*

*Corp. v. Star Board, Inc.*, 382 F. Supp. 2d 1362, 1367 (S.D. Fla. 2005) (expedited discovery granted ahead of a preliminary injunction).

As demonstrated below, plaintiff easily meets this standard here.

B.  **Plaintiff Has Demonstrated Good Cause For Expedited Depositions**

  1.  **Absent Expedited Depositions, Plaintiff Will Suffer Imminent and Irreparable Harm**

Unless expedited depositions of the defendants are granted, plaintiff will be irreparably harmed because it will be forced to make a decision on how to vote with regard to the Sale Agreement without the benefit of having received all material information. *See Gilmartin v. Adobe Resources Corp.*, 1992 Del. Ch. LEXIS 80, at *43 (April 6, 1992); *Edudata Corp. v. Scientific Computers, Inc.*, 599 F. Supp. 1084, 1088 (D. Minn. 1984) (in granting a temporary restraining order suspending a sale, the Court found that "shareholders could also be harmed by false or misleading disclosures."); *Lichtenberg v. Besicorp Group, Inc.,* 43 F. Supp.2d 376, 391 (S.D.N.Y. 1999) (finding misleading statements in proxy to cause irreparable harm because "fair corporate sufferance is an important right that should attach to every equity security bought on a public exchange" and this includes the "right to be free from deceptive proxy solicitations"); *Life Investors, Inc. v. AGO Holding, N.V., et al.*, 1981 U.S. App. LEXIS 16710 (8th Cir., 1981) (granting an injunction preventing defendant from continuing a tender offer because "[t]he [irreparable] harm arising …. cannot be remedied if the tender offer proceeds to consummation without corrective disclosures"); *Sonesta Int'l Hotels Corp. v. Wellington Assoc.*, 483 F.2d 247, 250 (2d Cir. 1973) (directing the district court to enter a preliminary injunction preventing consummation of a sale unless appellees made a supplemental disclosure to appellant's stockholders and finding that

*"preliminary injunctive relief is a particularly useful remedy for prevention of probable violations of the disclosure requirements* of the Act, for the reason that prior to consummation of the offer the court still has a variety of methods available to it for correction of the misstatements or omissions. But once the [sale] has been consummated it becomes difficult, and sometimes virtually impossible, for a court to unscramble the eggs."). (emphasis added.) (internal citations omitted).

Here, the defendants intend to consummate the Sale Agreement as soon as January 29, 2010. Absent expedited depositions and a preliminary injunction, Plaintiff will be forced to make a decision on how to vote with regard to the Sale Agreement without the benefit of having received adequate and material information. As a result, absent expedited depositions and a preliminary injunction, plaintiff will suffer imminent and irreparable harm.

### 2. Courts Often Grant Expedited Discovery In Advance Of A Hearing On Injunctive Relief

Courts have found that expedited discovery in advance of a hearing on injunctive relief is "particularly appropriate … because of the expedited nature of injunctive proceedings." *Ellsworth Assocs. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996). *See also Moscony v. Quaker Farms, LP*, 00-2285, 2000 U.S. Dist. LEXIS 17772, at *9 (E.D. Pa. Dec. 8, 2000 ("Some discovery in connection with a preliminary injunction request is also generally appropriate.") (internal citations omitted); *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 501 (5th Cir. 1982) (expedited discovery permitted prior to preliminary injunction hearing); *Acierno v. Mitchell*, 6 F.3d 970, 973 (3d Cir. 1993) (same); *Weinberger v. Amstar Corp.*, Cons. C.A. 7322, Hartnett, V.C., slip Op. at 2-3 (Del. Ch. Jan. 16, 1984) ("To deny plaintiffs the right to discovery at this time would be, in effect, to deny their right to a

preliminary injunction."). This is because expedited discovery "better enable[s] the court to judge the parties' interests and respective chances for success on the merits" at a preliminary injunction hearing. *Edudata Corp.*, 599 F. Supp. at 1088. *See also Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.,* 14 F. 3d. 1507, 1513 (11th 1994) (expedited discovery granted to provide parties with an opportunity to prepare for a later preliminary injunction hearing); *Ellsworth Assocs., Inc. v. U.S.*, 917 F. Supp. 841, 844 (D.D.C. 1996) (ordering expedited discovery where it would "expedite resolution of [plaintiffs'] claims for injunctive relief").

Moreover, the Delaware Courts[3] have found that an expedited discovery schedule is "quite conventional" in cases involving a change of corporate control because the "fast-moving" nature of such cases [may] result in the "subject matter of the suit – control of the corporation - … be[ing] fully resolved before [the time for discovery under applicable rules] may have arrived. *See American Stores Co. v. Luck Stores, Inc.*, 1988 WL 909330, at 2 (Del. Ch. Apr. 13, 1998) (noting that "the closing of a [sale] … is typically the reason in such cases to permit expedited discovery.")

Here, as set forth above, this case involves the sale of a company doing very well during a critical juncture in the United States economy. Due to the nature of this sale, much of the evidence necessary to permit plaintiff to proceed with its prosecution is entirely within the control of the defendants. Further, given the irreparable harm that plaintiff will suffer if it is forced to make a decision on how to vote with regard to the Sale Agreement without the benefit of having received adequate and material information, plaintiff intends to move for a

---

[3] As earlier noted, plaintiff alleges class claims for breaches of fiduciary duties under Delaware law in addition to its federal law claims.

preliminary injunction enjoining the consummation of the Sale Agreement pending trial. Given this, plaintiff requires limited expedited depositions so that it is afforded an adequate opportunity to utilize the material obtained during these depositions to prepare a fully developed motion for a preliminary injunction and present it to the Court for hearing on or before January 29, 2010.

### 3. The Balance of Equities Weigh In Favor of Limited Expedited Depositions

The critical importance of the limited depositions sought outweighs any inconvenience to defendants. In this regard, plaintiff seeks to depose only two of the ten defendants for a limited duration of 4 hours each. In light of (1) the limited discovery plaintiff seeks, (2) its instrumental nature in safeguarding the plaintiff's rights, and (3) the time limitations created by the impending deadline for the consummation of the Sale Agreement, the need for limited expedited depositions in this case clearly outweighs any hardship to defendants or third parties. These circumstances militate in favor of granting plaintiff the limited expedited depositions plaintiff seeks.

### C. The PSLRA Does Not Preclude The Relief Plaintiff Seeks

Finally, the PSLRA[4] does not preclude the relief plaintiff seeks. This is because the PSLRA specifically allows the Court the discretion to lift its automatic stay of discovery where particularized discovery is necessary to prevent undue prejudice to the moving party. 15 U.S.C. § 78 u-4(b)(3)(B).

Here, as described above, the transaction challenged by Plaintiff is scheduled to close as early as January 29, 2010. Further, Plaintiff will be unduly prejudiced if it is forced to

make a decision on how to vote with regard to the Sale Agreement without the benefit of receiving all material information. As the Delaware Chancery Court has noted, an uninformed vote almost always results in undue prejudice:

> stockholders will be irreparably harmed if the consummation of the Sale is not preliminarily enjoined. The right to cast an informed vote is specific, and its proper vindication in this case requires a specific remedy such as an injunction, rather than a substitutionary remedy such as damages. To allow the Sale to go forward would deprive the . . . stockholders of that right, whereas a preliminary injunction for a brief period to enable the defendants to make corrective disclosure is the remedy most likely to vindicate that right. . . . Moreover, no other relief would be effective. The Sale, if allowed to go forward, could not be undone . . . .

*Gilmartin v. Adobe Resources Corp.*, 1992 Del. Ch. LEXIS 80, at *43 (April 6, 1992). *See also Lichtenberg v. Besicorp Group, Inc.*, 43 F. Supp. 2d 376, 391 (S.D.N.Y. 1999) (finding misleading statements in proxy to cause irreparable harm because "fair corporate sufferance is an important right that should attach to every equity security bought on a public exchange" and this includes the "right to be free from deceptive proxy solicitations").

Moreover, plaintiff's request to take limited depositions will not place an undue burden on defendants because plaintiff seeks to depose only two defendants - Keith Olsen and William Luby - for approximately four hours each.

## VII.   CONCLUSION

For all of the foregoing reasons, plaintiff respectfully requests that the Court enter an order requiring defendants Keith Olsen and William Luby to make themselves available for depositions on an expedited basis.

---

[4]   The Private Securities Litigation Reform Act of 1995.

Dated: January 4, 2010                                          Respectfully Submitted,

s/ Julie Prag Vianale
Julie Prag Vianale
Florida Bar Number: 0184977
Trial Counsel
Kenneth Vianale
Florida Bar Number: 0169668
Trial Counsel
**VIANALE & VIANALE LLP**
2499 Glades Road, Suite 112
Boca Raton, Florida 33431
Telephone: (561)392-4750
Facsimile: (561)392-4775
kvianale@vianalelaw.com
jvianale@vianalelaw.com

**THE BRUALDI LAW FIRM, P.C.**
29 Broadway, 24th Floor
New York, NY 10006

*Of Counsel*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 4, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

**Richard B. Brualdi** rbrualdi@brualdilawfirm.com
**Kenneth J. Vianale**
e-file@vianalelaw.com,kvianale@vianalelaw.com,jvianale@vianalelaw.com

**Louise McAlpin**, louise.mcalpin@hklaw.com


I sent by e-mail and will on January 5, 2010 send by U.S. Mail copies to the following parties not currently registered with the CM-ECF system:

**Neil Potischman**
Davis Polk & Wardwell, LLP
1600 El Camino Real
Menlo Park, CA 94025

> s/ Julie Prag Vianale
> Julie Prag Vianale
> Florida Bar Number: 0184977
> **VIANALE & VIANALE LLP**
> 2499 Glades Road, Suite 112
> Boca Raton, Florida 33431
> Telephone: (561)392-4750
> Facsimile: (561)392-4775
> jvianale@vianalelaw.com