IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

| | |
|---|---|
| MICHAEL JIANNARAS, Individually and On Behalf of All Others Similarly Situated, ) | Case No. 09-CA-027950 |
| ) | Division L |
| Plaintiff, ) | |
| ) | FIRST AMENDED DIRECT |
| vs. ) | SHAREHOLDER CLASS ACTION |
| ) | COMPLAINT BASED UPON SELF |
| SWITCH & DATA FACILITIES COMPANY, ) | DEALING AND BREACH OF |
| INC., KATHLEEN EARLEY, GEORGE ) | FIDUCIARY DUTY |
| KELLY, WILLIAM LUBY, ARTHUR MATIN, ) | |
| KEITH OLSEN, G. MICHAEL SIEVERT, ) | |
| MICHAEL SILECK, M. ALEX WHITE, ) | |
| SUNDANCE ACQUISITION CORPORATION, ) | CLASS REPRESENTATION |
| and EQUINIX, INC., ) | |
| ) | |
| Defendants. ) | |
| ) | DEMAND FOR JURY TRIAL |
| ) | |

RECEIVED
DEC 2 1 2009
BY:_____

FILE COPY

Plaintiff, by his undersigned counsel, submits this Amended Complaint Based upon Self Dealing and Breach of Fiduciary Duty (the "Complaint") against the Defendants named herein.

## SUMMARY OF THE ACTION

1.      This is a direct stockholder class action brought by Plaintiff on behalf of the holders of Switch & Data Facilities Company, Inc. ("Switch & Data" or the "Company") common stock against Switch & Data and its senior officer and directors arising out of their attempts to provide certain Switch & Data insiders and directors with preferential treatment in connection with their efforts to complete the sale of Switch & Data to Equinix, Inc. ("Equinix") (the "Merger"). This action seeks equitable relief only.

2.      In pursuing the unlawful plan to squeeze out Switch & Data's public stockholders, the Defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and have aided and abetted such breaches by Switch & Data's officers and directors. Instead of attempting to obtain the highest value reasonably available for the Company's stockholders, Defendants spent a substantial effort tailoring the Merger to meet the specific needs of Equinix and certain Switch & Data insiders.

3.      Specifically, Defendants are timing the Merger to take advantage of the recent downturn in Switch & Data's shares to sell the Company at an illusory premium. In reality, the offered consideration does not reflect Switch & Data's financial performance. Switch & Data's shareholders stand to be deprived of the true value of their shares.

4.      Because Defendants dominate and control the business and corporate affairs of Switch & Data and are in possession of private corporate information concerning Switch & Data's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Switch & Data, which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

5.      In short, the Merger is designed to unlawfully divest Switch & Data's public stockholders of their holdings without providing them the maximized value to which they are

entitled. Defendants know that these assets will continue to produce substantial revenue and earnings.

6.      Moreover, the Defendants have failed to disclose all material information about the Merger. On November 25, 2009, the Defendants filed a Registration Statement on Form S-4 (the "Registration Statement") with the U.S. Securities and Exchange Commission ("SEC") that purports to provide Company shareholders with information that is necessary and sufficient to enable the Company shareholders to cast informed, intelligent, and rational votes on whether to approve the Merger. This SEC filing is materially misleading, false, and omits substantial information about the Merger – information to which Company shareholders must have access in order to cast informed, intelligent, and rational votes on whether to approve the Merger. Importantly, without that information, Company shareholders will be irreparably harmed. This action, therefore, also seeks an equitable remedy that requires the Defendants to provide the necessary information about the Merger to Company shareholders and to otherwise correct the materially false and misleading Registration Statement.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this County, or is an individual who has sufficient minimum contacts with Florida so as to render the exercise of jurisdiction by the Florida courts permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this Court because one or more of the Defendants either resides in or maintains executive offices in this County, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Switch & Data's shareholders occurred in this County, and Defendants have received substantial compensation in this County by doing business here and engaging in numerous activities that had an effect in this County.

## PARTIES

9.     Plaintiff Michael Jiannaras is, and at all times relevant hereto was, a shareholder of Switch & Data.

10.     Defendant Switch & Data is a Delaware corporation headquartered in Tampa, Florida. Switch & Data provides colocation and network neutral interconnection services in the United States. The Company is publicly traded in the NASDAQ exchange under the stock ticker of SDXC. According to Switch & Data's quarterly report filed with the SEC on November 3, 2009, there were over 34 million outstanding shares of Switch & Data common stock as of October 15, 2009.

11.     Defendant Equinix is a Delaware Corporation.  Equinix, Inc. provides network-neutral colocation, interconnection and managed information technology (IT) infrastructure services to enterprises, content providers and financial companies.

12.     Defendant Sundance Acquisition Corporation is a wholly-owned subsidiary of Equinix that was formed to effectuate the Merger.

13.     Defendant Kathleen Earley ("Earley") is a director of Switch & Data, and has served in that position since 2003.

14.     Defendant George Kelly ("Kelly") is a director of Switch & Data, and has served in that position since 1999.  According to the Company's Schedule 14A filed on April 6, 2009 in connection with Switch & Data's 2009 Annual Meeting of Stockholders, Kelly beneficially owns 6,838,631 shares of Switch & Data common stock[1], or 19.7% of the outstanding common stock of the Company.

15.     Defendant William Luby ("Luby") is Chairman of the Switch & Data Board of Directors, and has served in that position since 1999.  According to the Company's Schedule 14A filed on April 6, 2009 in connection with Switch & Data's 2009 Annual Meeting of Stockholders,

---

[1] Kelly, as the Chairperson of a separate business entity that controls other entities that own shares in the Company, has voting and dispositive power over these shares.

Luby beneficially owns 5,456,612 shares of Switch & Data common stock[2], or 15.7% of the outstanding common stock of the Company.

16.    Defendant Arthur Matin ("Matin") is Chairman of the Switch & Data Board of Directors, and has served in that position since 2003.

17.    Defendant Keith Olsen ("Olsen") is a director of Switch & Data, as well as Company President and CEO, and has served in those positions since 2004.  According to the Company's Schedule 14A filed on April 6, 2009 in connection with Switch & Data's 2009 Annual Meeting of Stockholders, Olsen beneficially owns 722,628 shares of Switch & Data common stock, or 2.1% of the outstanding common stock of the Company.

18.    Defendant G. Michael Sievert ("Sievert") is a director of Switch & Data, and has served in that position since 2008.

19.    Defendant Michael Sileck ("Sileck") is a director of Switch & Data, and has served in that position since 2008.

20.    Defendant M. Alex White ("White") is a director of Switch & Data, and has served in that position since 2006.

21.    The Defendants named above in ¶¶13-20 are sometimes collectively referred to herein as the "Individual Defendants."   The Individual Defendants collectively own and/or control over 37.5% of the outstanding shares of the Company.  The Individual Defendants have entered into a voting agreement with Equinix (the "Voting Agreement"), whereby the Individual Defendants, along with other shareholders of the Company, have agreed to vote up to 35% of their shares in favor of the Merger.

## DEFENDANTS' FIDUCIARY DUTIES

22.    Under applicable law, in any situation where the directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; or

---

[2] Luby, as one of two controlling persons in separate business entities that own shares in the Company, has voting and dispositive power over these shares.

(ii) a break up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium. To diligently comply with these duties, the directors and/or officers may not take any action that:

    (a)    adversely affects the value provided to the corporation's shareholders;

    (b)    will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

    (c)    contractually prohibits themselves from complying with their fiduciary duties;

    (d)    will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

    (e)    will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

    23.    In accordance with their duties of loyalty and good faith, the Defendants, as directors and/or officers of Switch & Data, are obligated under applicable law to refrain from:

    (a)    participating in any transaction where the directors' or officers' loyalties are divided;

    (b)    participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

    (c)    unjustly enriching themselves at the expense or to the detriment of the public shareholders.

    24.    Plaintiff alleges herein that Defendants, separately and together, in connection with the Merger, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, candor, good faith and independence owed to Plaintiff and other public shareholders of Switch & Data. Defendants stand on both sides of the transaction, are engaging in self dealing, are obtaining for themselves personal benefits, including personal financial benefits not shared equally by Plaintiff or the Class, and choosing not to provide shareholders with all information necessary to

make an informed decision in connection with the Merger. As a result of Defendants' self dealing and divided loyalties, neither Plaintiff nor the Class will receive adequate or fair value for their Switch & Data common stock in the proposed Merger.

25.     Because Defendants are knowingly or recklessly breaching their duties of loyalty, good faith and independence in connection with the Merger, the burden of proving the inherent or entire fairness of the Merger, including all aspects of its negotiation, structure, price and terms, is placed upon Defendants as a matter of law.

**BACKGROUND TO THE PROPOSED MERGER**

26.     Switch & Data is a provider of network-neutral data centers that house, power and interconnect the Internet. The Company operates 34 sites in the United States and Canada. In its data centers, the Company provides network-neutral interconnection and colocation services.

27.     The Company's network-neutral data centers are specifically designed to house the networking and computing equipment its customers use to aggregate and distribute data and digital media content. The Company's network provider customers, who are international carriers and global telecommunications carrier and Internet service providers, include AT&T, Level 3 Communications, ChungHwa Telecom, Singapore Telecommunications, Telecom Italia and Tata Communications. Its content provider customers include Apple, CBS Broadcasting, Google, and Microsoft. Its service provider customers include Adobe, Akamai, Limelight Networks and Verisign.

28.     In February 2007, Switch & Data went public with an initial public offering ("IPO") at $17.00 per share. The Company's stock primarily traded above that level until the global economic recession hit home.

29.     However, Switch & Data has recently performed very well for its investors. Over the past year, Switch & Data's stock has increased 105% from a price of $7.03 per share on October 22, 2008 to $14.40 per share (the closing price prior to the announcement of the Merger):



30.     Switch & Data is well positioned to climb back to pre-recession levels and beyond.

For instance, the Company recently issued the following press release announcing its third quarter

2009 financial and operating results:

### Switch and Data Reports Third Quarter 2009 Financial and Operating Results

**Revenue Increased 21%**

**Adjusted EBITDA Increased 51%**

**Secured Incremental $100 million of Financing**

**Following the Quarter, Entered Agreement to be Acquired by Equinix**

**Press Release**
Source: Switch & Data Facilities Company, Inc.
On 4:05 pm EDT, Tuesday October 27, 2009

TAMPA, Fla.--(BUSINESS WIRE)--Switch & Data Facilities Company, Inc. (NASDAQ:SDXC - News), a leading provider of network neutral data center and Internet exchange services, today reported financial results for the three months ended September 30, 2009.

**Results of Operations**

Total revenues for the third quarter ended September 30, 2009 increased 21.4% to $53.5 million from $44.1 million in the comparable period in 2008. Recurring revenues, which consist of colocation and interconnection services, were $48.8 million in the third quarter 2009, an increase of 17.3% over the same period in the prior year. Non-recurring revenues in the third quarter 2009, representing one time installation fees and services, was $4.7 million in the third quarter 2009, compared to $2.5 million in the comparable period in 2008.

"Business momentum continued in the third quarter" stated Keith Olsen, President and CEO. "Our third quarter results amplify the strength of our operating model and the value we provide to customers. With increasing needs of network centric customers, our broad footprint, carrier densities and access to population centers are key value drivers for our business."

Cost of revenues, excluding depreciation and amortization, for the third quarter 2009 was $25.9 million as compared to $23.7 million for the third quarter 2008. As a percentage of revenues, cost of revenues improved to 48.4% in the third quarter of 2009 from 53.9% in the same period of the prior year.

Sales and marketing costs for the third quarter 2009 were $4.7 million for the third quarter as compared to $4.6 million in the comparable quarter in 2008. General and administrative expenses were $5.1 million for the third quarter as compared to $4.4 million for the third quarter 2008.

Operating income increased 94.2% to $7.3 million in the third quarter of 2009 as compared to $3.8 million in the comparable period in 2008.

Adjusted EBITDA increased 50.5% to $21.0 million in the third quarter of 2009 as compared to $14.0 million in the comparable period in 2008. Adjusted EBITDA margins increased to 39.3% in the third quarter, from 31.7% in the comparable period in 2008. The Company defines Adjusted EBITDA as operating income from continuing operations, plus depreciation and amortization, stock-based compensation expense and other non-cash items such as deferred rent. The Company calculates Adjusted EBITDA margin as Adjusted EBITDA divided by total revenues. A reconciliation between GAAP information and non-GAAP information contained in this press release can be found in the table immediately following the Consolidated Statements of Cash Flow, as well as on the Company's website in the Investor Relations section.

Net income for the period was $2.6 million. Earnings per share was $0.07 per basic and diluted share.

**Balance Sheet, Cash Flows, and Business Outlook**

The Company had cash and cash equivalents of $22.6 million on September 30, 2009. Bank debt outstanding on September 30, 2009 was $142.5 million. Capital expenditures in the quarter were $15.9 million and $54.3 million year-to-date.

The Company expects the following financial results for 2009:

- Total revenues are expected to be $206 million
- Adjusted EBITDA is expected to be $76 million
- Capital expenditures are projected to be $75 million

Switch & Data does not provide forward-looking guidance for certain financial data, such as depreciation, amortization, net income (loss) from operations, cash generated from operating activities and cash used in investing activities and, as a result, is not able to provide a reconciliation of GAAP to non-GAAP financial measures for forward-looking data. The Company intends to calculate the various non-GAAP financial measures in future periods consistent with the calculation method utilized for the quarter ended September 30, 2009 as presented within this press release.

\* \* \*

31.    Indeed, the Company's second quarter 2009 results were just as positive.  The

Company issued the following press release regarding its promising second quarter results:

*Revenue Increased 17.8% Adjusted EBITDA Increased 32.4% Increased Adjusted EBITDA margin to 38.0%*

**TAMPA, Fla.--(BUSINESS WIRE)--**Jul. 28, 2009-- Switch & Data Facilities Company, Inc. (NASDAQ:SDXC), a leading provider of network neutral data center and Internet exchange services, today reported financial results for the three months ended June 30, 2009.

**Results of Operations**

Total revenues for the second quarter ended June 30, 2009 increased 17.8% to $49.4 million from $41.9 million in the comparable period in 2008. Recurring revenues, which consist of colocation and interconnection services, were $47.0 million in the second quarter 2009, an increase of 18.8% over the same period in the prior year. Non-recurring revenues in the second quarter 2009, representing one time installation fees and services, were $2.4 million in the second quarter of both 2009 and 2008.

"Customer demand, improved bookings and increasing margins continues to fuel our business momentum." stated Keith Olsen, Switch and Data President and CEO. Mr. Olsen further commented "our investments coupled with focused execution resulted in solid second quarter results."

- 9 -

Cost of revenues, excluding depreciation and amortization, for the second quarter 2009 was $24.5 million as compared to $21.6 million for the second quarter 2008. As a percentage of revenues, cost of revenues improved to 49.6% in the second quarter of 2009 from 51.7% in the same period of the prior year.

Sales and marketing costs for the second quarter 2009 were $5.2 million for the second quarter as compared to $4.9 million in the comparable quarter in 2008. General and administrative expenses were $4.4 million for the second quarter as compared to $4.3 million for the second quarter 2008.

Operating income increased 12.7% to $4.9 million in the second quarter of 2009 as compared to $4.3 million in the comparable period in 2008.

Adjusted EBITDA increased 32.4% to $18.7 million in the second quarter of 2009 as compared to $14.2 million in the comparable period in 2008. Adjusted EBITDA margins increased to 38.0% in the second quarter, from 33.8% in the comparable period in 2008.

32.     Additionally, the Company's first quarter 2009 results were also promising.  The

Company issued the following press release regarding its promising first quarter results:

### *Revenue Grew 18.5% EBITDA Increased 31.7% EBITDA Margin Expanded From 31.7% to 35.2%*

**TAMPA, Fla.--(BUSINESS WIRE)**--Apr. 28, 2009-- Switch & Data Facilities Company, Inc. (NASDAQ:SDXC), a leading provider of network neutral data center and Internet exchange services, today reported strong financial results for the first quarter ended March 31, 2009.

"In the first quarter we delivered strong sequential recurring revenue growth and improved margins supported by continued demand for our services," commented Keith Olsen, Switch and Data President and CEO. Added, Mr. Olsen, "Switch and Data posted an overall solid performance."

**First Quarter 2009**

Total revenues increased 18.5% from $39.8 million to $47.1 million in the first quarter of 2009 compared to the same period in 2008. Recurring revenues, which consist of colocation and interconnection services, increased 19.2% over the same period in the prior year to $44.9 million. Non-recurring revenues, representing one time installation fees and services, were $2.3 million in the first quarter 2009, compared to $2.2 million in the same period of the prior year.

EBITDA increased 31.7% from $12.6 million to $16.6 million in the first quarter of 2009 compared to the same period in 2008. EBITDA margins increased from 31.7% to 35.2% in the first quarter of 2009 compared to the same period 2008. (A reconciliation between GAAP information and non-GAAP information contained in this press release can be found in the table immediately following the Consolidated

Statements of Cash Flow, as well as on the Company's website in the Investor Relations section.)

33.    Similarly, the Company's annual results for fiscal year 2008 were also very positive for the stockholders. The Company provided the following release,

***2008 Revenue Increased 25% 2008 EBITDA Increased 33% 4Q08 Revenue and EBITDA Increased 22% and 25%***

TAMPA, Fla.--(BUSINESS WIRE)--Feb. 17, 2009-- Switch & Data Facilities Company, Inc. (NASDAQ:SDXC), a leading provider of network neutral data center and Internet exchange services, today reported strong financial results for the three months and for the year ended December 31, 2008.

"In 2008 we delivered strong revenue and EBITDA growth," stated Keith Olsen, Switch and Data President and CEO. "We continue to balance the counteracting dynamics of economic headwinds and strength in market demand. Our outlook for growth in 2009 is centered on continued strength in demand for our services."

**Fourth Quarter 2008**

Total revenues for the fourth quarter ended December 31, 2008 increased 22% to $45.8 million from $37.5 million in the comparable period in 2007. Recurring revenues, which consist of colocation and interconnection services, were $42.9 million in the fourth quarter 2008, an increase of 22% over the same period in the prior year. Non-recurring revenues in the fourth quarter 2008, representing one time installation fees and services, were $2.8 million compared to $2.2 million in the prior year.

EBITDA, which the Company defines as operating income from continuing operations, plus depreciation and amortization, stock-based compensation expense and other non-cash items such as deferred rent, increased 25% to $15.8 million in the fourth quarter of 2008 as compared to $12.7 million in the comparable period in 2007. EBITDA margins increased to 34.6% in the fourth quarter, from 33.8% in the comparable period in 2007.

\*        \*        \*

**Full Year 2008**

For the year ended December 31, 2008 total revenue increased 25% to $171.5 million. Recurring revenue was $161.7 million, an increase of 24% over the comparable period in 2007. For the year ended December 31, 2008, non-recurring revenue was $9.8 million, an increase of 31% over the same period in the prior year.

For the year ended December 31, 2008, cost of revenues, excluding depreciation and amortization, was $90.1 million, up from $71.0 million for the year ended December 31, 2007. As a percentage of revenues, cost of revenues was 52.5% in 2008 as

compared to 51.6% in the same period of the prior year. For the year ended December 31, 2008, sales and marketing costs were $19.7 million as compared to $16.3 million for the same period in 2007. For the year ended December 31 2008 general and administrative expenses were $17.7 million as compared to $15.0 million for year ended December 31, 2007.

For the year ended December 31, 2008, EBITDA increased 33% over full year 2007 to $56.6 million from $42.5 million.

34.    Further, based on these stellar results, analysts estimate that Switch & Data will relatively outperform competitors in the industry in earnings substantially in the next five fiscal years.[3]

## THE MERGER

35.    Switch & Data's board of directors had regularly examined a potential business combination with Equinix in 2006. These discussions, however, were terminated prior to Switch & Data's initial public offering in early 2007.

36.    Subsequently, between January 2009 and September 2009, the Company conducted discussions about a business combination with another party, and a non-disclosure agreement was signed with that third party in about March 2009.    Starting in approximately May 2009, the Company also began discussions with Equinix, and signed a non-disclosure agreement in about July 2009.

37.    Despite the fact that the Company had signed the non-disclosure agreement with the third party months before the Company had entered into a non-disclosure agreement with Equinix, in about September 2009, the Board inexplicably determined: "[A] transaction with the International Party was unlikely to result in value to Switch and Data's stockholders equal to or greater than the proposed transaction with Equinix. Also, based upon the Switch and Data board of directors' knowledge of the industry and the analysis of Switch and Data's financial advisors, the board determined not to approach the other participants in the industry." Thus on September 26, 2009, the

---

[3]

http://moneycentral.msn.com/investor/invsub/analyst/earnest.asp?Page=EarningsGrowthRates&Symbol=SDXC .

Company informed the third party that it "was terminating discussions regarding a potential transaction."

38.    Less than a month later, and despite the Individual Defendants' fiduciary duties to maximize shareholder value, the Company hurriedly entered into a Merger agreement with Equinix. On October 21, 2009, after the close of the market, the Defendants issued the following press release that announced the sale of Switch & Data to Equinix:

### Equinix Continues to Expand Its Global Service Offering; Extending to New, Customer-driven Markets in North America

**Foster City, CA and Tampa, FL–October 21, 2009** – Equinix, Inc. (Nasdaq: EQIX), a provider of global data center services, and Switch & Data Facilities Company, Inc. (Nasdaq: SDXC), a leading provider of data center and Internet exchange services, have entered a definitive agreement for Equinix to acquire Switch and Data in a transaction valued at approximately $689 million in cash and stock, based on yesterday's market close. The combination of the two companies will further strengthen Equinix's leadership position in the global data center services market by extending the company's presence to 16 new markets across North America. Equinix will integrate Switch and Data's data center business and operations, including the company's 34 data centers in 22 markets in the U.S. and Canada. The acquisition will add more than one million gross square feet of data center capacity, bringing Equinix's total global footprint to 79 data centers in 34 markets and more than six million square feet across the North American, European and Asia-Pacific markets. It will allow Equinix to immediately expand into new strategic markets, including Atlanta, Denver, Miami, Seattle and Toronto, as well as provide a platform for future expansion of Switch and Data assets.

The acquisition will help the companies' customers respond to two broad market trends. The rapid growth of demand for online information is requiring companies to store and distribute larger volumes of latency sensitive assets and applications at the network edge, near local population centers. At the same time, the market compels companies to develop global aggregation and distribution strategies for their digital assets and applications. The transaction is expected to give Equinix customers broader access to local markets for their network edge deployments, and Switch and Data customers a comprehensive solution to their global data center needs. The customers of both companies will benefit from a stronger product portfolio and capacity pipeline in a market where demand continues to outpace supply, and from doing business with a partner that brings together the capabilities of two companies with strong reputations for operational excellence and high customer satisfaction.

"The strategic acquisition of Switch and Data by Equinix further strengthens Equinix's position as the most comprehensive global data center services provider across North America, Asia- Pacific and Europe," said Steve Smith, president and CEO of Equinix. "Our complementary business models, coupled with Switch and

Data's broad North American market coverage, provide a platform for strong growth as well as an opportunity to accommodate our customers' demands for additional services."

"For more than a decade, Switch and Data has provided colocation and data center services to support the needs of the world's leading online brands," said Keith Olsen, president and CEO of Switch and Data. "These businesses rely on Switch and Data to provide secure locations for them to connect and safeguard their mission-critical applications. The combination of Switch and Data's North American site footprint and Equinix's global reach will increase our addressable market, enhance our customers' value, and drive incremental value to our stockholders."

The parties are targeting completion of the transaction in the first quarter of 2010. The transaction will be subject to customary closing conditions, including the approval of Switch and Data's stockholders and regulatory approvals. The transaction is expected to qualify as a tax-free exchange to Switch and Data's stockholders with respect to the stock portion of the merger consideration. Equinix was advised by J.P. Morgan Securities Inc. and Davis Polk & Wardwell LLP. Switch and Data's lead financial advisor for the transaction was Piper Jaffray & Co., and Deutsche Bank Securities Inc. and RBC Capital Markets served as co-advisors; Switch and Data's legal advisor was Holland & Knight LLP. Raymond James & Associates, Inc. provided a fairness opinion to Switch and Data's Board of Directors with respect to this transaction.

**Financial Terms of the Transaction**

Under the terms of the agreement, Switch and Data stockholders will have the opportunity to elect to receive either 0.19409 shares of Equinix stock or $19.06 in cash for each share of Switch and Data stock. The overall consideration to be paid by Equinix in the acquisition will be 80% Equinix stock, 20% cash. In the event that holders of more than 80% of Switch and Data's stock elect to receive Equinix stock or holders of more than 20% of Switch and Data's stock elect to receive cash, the merger consideration will be pro-rated to achieve these proportions. In addition, a portion of the cash consideration payable to Switch and Data stockholders may be replaced by an equivalent amount of Equinix stock to the extent necessary to enable the transaction to qualify as a tax-free exchange. The cash portion of the merger consideration will be financed through Equinix's existing cash on hand. Switch and Data's directors, executive officers and certain of its significant stockholders have agreed to vote shares representing 35% of Switch and Data's outstanding stock in favor of the transaction.

\* \* \*

# SELF-DEALING

39.     By reason of their positions with Switch & Data, the Individual Defendants are in possession of non-public information concerning the financial condition and prospects of Switch &

Data, and especially the true value and expected increased future value of Switch & Data and its assets, which they have not disclosed to Switch & Data's public stockholders. Moreover, despite their duty to maximize shareholder value, the Defendants have clear and material conflicts of interest and are acting to better their own interests at the expense of Switch & Data's public shareholders.

40.    The proposed sale is wrongful, unfair and harmful to Switch & Data's public stockholders, and represents an effort by Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Class members. Specifically, Defendants are attempting to deny Plaintiff and the Class their shareholder rights via the sale of Switch & Data on terms that do not adequately value the Company. Accordingly, the Merger will only benefit Defendants and Equinix.

41.    For instance in the memorandum to Switch & Data employees about the Merger, Defendant Olsen provided a statement from Steve Smith, Equinix's President and CEO,

> The entire Equinix team and I are very excited about the strategic fit of Switch and Data. The value you bring will position the new Equinix as the most comprehensive data center services provider around the globe. From our complementary business models, to our high quality data center services solutions, to our shared commitment to customer care – this combination of assets and employee talent is a true win/win for all of us and the markets we serve. We look forward to welcoming the Switch and Data employees and customers to Equinix.

42.    Defendant Olsen went on to tell the Company employees in the memorandum that, "By creating a company with more than $1 billion in revenue and operations on four continents we are evolving our business to better serve our customers and compete on this larger global stage." Switch & Data's shareholders will not reap this benefit to the same extent that Defendants will. Indeed, in an October 21, 2009 Form 425 filing with the SEC, Equinix further proclaims, "The Switch and Data deal will allow Equinix to extend its industry leadership as the #1 Global Colocation Data Center Services Provider." Likewise, in a separate October 21, 2009 Form 425 Filing with the SEC, Equinix submitted a graphic analysis of the Merger, acknowledging, among other things, that "Switch and Data provides a footprint in key new markets (Atlanta, Denver, Miami, Seattle, Toronto)."

43.   The Agreement and Plan of Merger entered into between the Company and Equinix (the "Merger Agreement") contains certain provisions which are unfair to the shareholders of the Company.

44.   For instance, the Merger Agreement contains a "No Solicitation" provision, which reads in part:

> Section 6.03 . *No Solicitation; Other Offers.* (a)  General Prohibitions . **Neither the Company nor any of its Subsidiaries shall**, nor shall the Company or any of its Subsidiaries authorize or permit any of its or their officers, directors, employees, investment bankers, attorneys, accountants, consultants or other agents or advisors (" Representatives ") to, directly or indirectly, (i) **solicit, initiate or take any action to facilitate or encourage the submission of any Acquisition Proposal, (ii) enter into or participate in any discussions or negotiations with, furnish any information relating to the Company or any of its Subsidiaries or afford access to the business, properties, assets, books or records of the Company or any of its Subsidiaries to, otherwise cooperate in any way with, or knowingly assist, participate in, facilitate or encourage any effort by any Third Party that is seeking to make, or has made, an Acquisition Proposal,** (iii) fail to make, withdraw or modify in a manner adverse to Parent the Company Board Recommendation (or recommend an Acquisition Proposal or take any action or make any statement inconsistent with the Company Board Recommendation) (any of the foregoing in this clause (iii), an " Adverse Recommendation Change "), (iv) grant any waiver or release under any standstill or similar agreement with respect to any class of equity securities of the Company or any of its Subsidiaries, (v) approve any transaction under, or any Person becoming an "interested stockholder" under, Section 203 of Delaware Law or (vi) enter into any agreement in principle, letter of intent, term sheet, merger agreement, acquisition agreement, option agreement or other similar instrument relating to an Acquisition Proposal. It is agreed that any violation of the restrictions on the Company set forth in this Section by any Representative of the Company or any of its Subsidiaries shall be a breach of this Section by the Company.

(Emphasis added).

45.   This provision in the Merger Agreement severely limits the Company's ability to effectively communicate with potential bidders and adequately consider potential offers.

46.   Section 6.03 of the Merger Agreement further provides Equinix with other unreasonable advantages over other potential bidders:

> (c)  Required Notices . The Board of Directors of the Company shall not take any of the actions referred to in Section 6.03(b) unless the Company shall have delivered to Parent a prior written notice advising Parent that it intends to take such action, and, after taking such action, the Company shall continue to advise Parent on a current basis of the status and terms of any discussions and negotiations with any Third

Party. In addition, *the Company shall notify Parent promptly (but in no event later than 24 hours) after receipt by the Company (or any of its Representatives) of any Acquisition Proposal, any indication that a Third Party is considering making an Acquisition Proposal or any request for information relating to the Company or any of its Subsidiaries or for access to the business, properties, assets, books or records of the Company or any of its Subsidiaries by any Third Party that may be considering making, or has made, an Acquisition Proposal.* The Company shall provide such notice orally and in writing and shall identify the Third Party making, and the terms and conditions of, any such Acquisition Proposal, indication or request. The Company shall keep Parent fully informed, on a current basis (and in any event within 24 hours of the occurrence of any material changes, developments, discussions or negotiations), of the status and details of any such Acquisition Proposal, indication or request, and shall promptly (but in no event later than 24 hours after receipt) provide to Parent copies of all correspondence and written materials sent or provided to the Company or any of its Subsidiaries that describes any terms or conditions of any Acquisition Proposal (as well as written summaries of any oral communications addressing such matters). Any material amendment to any Acquisition Proposal will be deemed to be a new Acquisition Proposal for purposes of the Company's compliance with this Section 6.03(c).

(d) " <u>Last Look</u> ". *The Board of Directors of the Company shall not make an Adverse Recommendation Change in response to an Acquisition Proposal unless* (i) such Acquisition Proposal constitutes a Superior Proposal, (ii) the Company promptly notifies Parent in writing of its intention to do so, attaching the most current version of the proposed agreement under which such Superior Proposal is proposed to be consummated and the identity of the third party making the Superior Proposal, and (iii) *Parent does not make, within five Business Days after its receipt of that written notification, an offer that is at least as favorable to the stockholders of the Company as such Superior Proposal* (it being understood and agreed that the Company shall not make an Adverse Recommendation Change in response to such Superior Proposal during such five Business Day period and any amendment to the financial terms or other material terms of such Superior Proposal shall require a new written notification from the Company and a new five Business Day period under this Section 6.03(d)). The Board of Directors of the Company shall not make an Adverse Recommendation Change pursuant to Section 6.03(b)(iii) unless (A) the Company notifies Parent, in writing at least five Business Days before taking that action, of its intention to do so, attaching a reasonably detailed explanation of the facts underlying the determination by the Board of Directors of the Company that an Intervening Event has occurred and (B) during such five Business Day period, if requested by Parent, the Company has engaged in good faith negotiations with Parent to amend this Agreement in a manner that would obviate the need for an Adverse Recommendation Change in light of the Intervening Event.

(Emphasis added).

47.    The provisions in Sections 6.03(c) and (d) are further evidence of the unlevel playing field Defendants are forcing other potential bidders to play on.

48.    In light of the foregoing, the Individual Defendants must, as their fiduciary obligations require:

- Withdraw their consent to the sale of Switch & Data and allow the shares to trade freely;

- Act independently so that the interests of Switch & Data's public stockholders will be protected;

- Adequately ensure that no conflicts of interest exist between Defendants' own interests and their fiduciary obligation to maximize stockholder value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interests of Switch & Data's public stockholders; and

- Consider alternatives to the proposed Merger including the solicitation of bids from interested third-parties to assure that the Company's shareholders are receiving the maximum value for their shares.

## DEFENDANTS FAILED TO MAXIMIZE SHAREHOLDER VALUE

49.    As a result of Defendants' conduct, Switch & Data's public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which they are entitled in a sale of their Company. In order to meet their fiduciary duties, Defendants are obligated to maximize shareholder value, not structure a preferential deal for themselves.

## DEFENDANTS PROVIDE FALSE AND MATERIALLY MISLEADING INFORMATION ABOUT THE MERGER

50.    On November 25, 2009, the Defendants filed a Registration Statement on Form S-4 with the SEC that purports to provide Company shareholders with information that is necessary and sufficient to enable the Company shareholders to cast informed, intelligent, and rational votes on whether to approve the Merger. Indeed, the SEC filing purports to explain the Individual Defendants' reasons for consenting to the Merger Agreement, including the background to the negotiation process, as well as the steps taken by the Individual Defendants to assess, evaluate, and eventually enter into the Merger Agreement. However, the purported disclosures contained therein are inadequate and do not provide shareholders with sufficient material information with which to make an informed decision about whether to vote in favor or against the Merger Agreement.

51.     For instance, the Registration Statement omits material information with respect to the process and events leading up to the Proposed Transaction, as well as the opinion and analyses of Switch & Data's financial advisors, in the following manner:

(a)     The Registration Statement is materially misleading in that it fails to disclose any significant detail concerning the selection and retention of financial and legal advisors by the Company, including the process that led to the retention of each such advisor and the past relationship between Switch & Data and those advisors, Equinix and those advisors, and the nature and amount of remuneration provided by Switch & Data and/or Equinix for those services. In that regard, the undisclosed circumstances surrounding the engagement of Piper Jaffray are particularly material considering that a representative of Equinix contacted Piper Jaffray about a potential transaction with the Company before Switch & Data's Board had even retained Piper Jaffray;

(b)     The Registration Statement indicates that the Board was advised by Piper Jaffray, Deutsche Bank, Royal Bank of Canada ("RBC"), and Raymond James & Associates ("Raymond James") to assist in connection with the Proposed Transaction and/or the consideration of strategic alternatives. Nowhere, however, does it explain why so many advisors were needed, whether conflicts or other issues caused the retention of so many advisors, and the amount and nature of the remuneration provided to Piper Jaffray, Deutsche Bank, RBC, and Raymond James for their services. The Registration Statement is thus misleading in that regard;

(c)     The Registration Statement is materially misleading in that it fails to explain the amount or nature of future investment banking or other financial services that Raymond James is currently providing or expects to provide to Equinix or the Company. Moreover, the Registration Statement is materially misleading in that it fails, in any fashion, to quantify the anticipated fees and revenues to Raymond James for the provision of these services. A reasonable shareholder would find this information material in assessing the ability of Raymond James to render an impartial fairness opinion;

(d)     The Registration Statement is materially misleading in that it fails to explain the amount or nature of future investment banking or other financial services that Piper Jaffray, Deutsche Bank, and RBC are currently providing or expect to provide to Equinix or the Company.

Moreover, the Registration Statement is materially misleading in that it fails, in any fashion, to quantify the anticipated fees and revenues to these entities for the provision of any such services. A reasonable shareholder would find this information material in assessing the ability of these advisors to render impartial assistance to the Board. Likewise, the Registration Statement is materially misleading in that it fails to disclose the fees to be received by Piper Jaffray, Deutsche Bank, and RBC in connection with the Proposed Transaction;

(e)     The Registration Statement is materially misleading in that it fails to disclose why the Board determined that it was appropriate to negotiate and agree to the Proposed Transaction before conducting any kind of market check. This information is particularly material in light of the fact that the Company cites a "lack of competitive bids" as one of the reasons for approving the Merger Agreement. The Registration Statement also is materially misleading in that it fails to disclose why the Board seemingly abandoned attempting to obtain a provision in the Merger Agreement that would allow for a post-signing market check to occur;

(f)     The Registration Statement is materially misleading in that it fails to disclose why the Individual Defendants or their advisors failed to obtain any sort of "collar" or "floor" for the stock component of the consideration being offered in the Proposed Transaction;

(g)     Although the Registration Statement mentions that the Board may have considered allowing the Company to remain a stand-alone entity, the disclosure document is materially misleading in that it fails to provide any sort of meaningful detail regarding the analysis and considerations of the Board in that regard, especially in light of the Company's anticipated continued revenue growth as reflected in the financial forecasts that have been disclosed;

(h)     The Registration Statement indicates that Deutsche Bank began acting as a financial advisor to the Company on or around October 1, 2009. Subsequently, on October 7, 2009, Deutsche Bank provided Switch & Data's Board with its analysis of the Proposed Transaction with Equinix. Five days later, Deutsche Bank participated in a due diligence session. After that session, however, the Registration Statement reflects that Deutsche Bank had a significantly decreasing amount of involvement in the process. As a result, the Registration Statement is materially misleading in that it fails to disclose why the Board retained Deutsche Bank, the substance of

Deutsche Bank's analysis on October 7, 2009, the Board's reaction to that analysis, whether the Board diminished the scope of Deutsche Bank's engagement as a result of that analysis or any other reason(s), and why the Board apparently never sought from Deutsche Bank, and Deutsche Bank apparently never provided, an opinion regarding the fairness of the Proposed Transaction;

(i)    The Registration Statement is materially misleading in that it fails to disclose why the Board agreed to enter into an exclusive negotiations with Equinix without conducting any sort of market check, especially in light of the interest of the "International Party" described in the Registration Statement. In that regard, the Registration Statement also is materially misleading in that it fails to provide any quantification of the range of values discussed with the International Party;

(j)    The Registration Statement is materially misleading in that it fails to describe or quantify the synergies considered by Raymond James, Piper Jaffray, Deutsche Bank, RBC, and/or the Switch & Data Board in approving the Merger Agreement. This information is material to stockholders who wish to understand and confirm, among other things, the value to them of the Company being acquired by a synergistic buyer that can offer increased consideration, and whether such factors were considered by the Board under the circumstances;

(k)    The Registration Statement is materially misleading in that it fails to disclose the reasons why Piper Jaffray did not provide the Board with a Fairness Opinion in connection with the Proposed Transaction. This information is especially material in light of the fact that at least on one occasion (September 9, 2009), Piper Jaffray discussed with the Board its views on valuation of the Company. As a result, those views also must be disclosed to make this particular partial disclosure complete and non-misleading;

(l)    The Registration Statement is materially misleading in that it fails to disclose the multiples observed for the entities considered in connection with Raymond James' Selected Public Companies Analysis, which allows shareholders to better understand and weight their consideration of these entities. The Registration Statement further is materially misleading in that it fails to disclose whether any particular entities were excluded from what appears to be a relatively small sample of four peer companies and the reasons for that exclusion;

(m)    The Registration Statement is materially misleading in that it fails to disclose the multiples observed for the transactions considered in connection with Raymond James' Selected Transaction Analysis, which allows shareholders to better understand and weight their consideration of the transactions utilized in connection with this analysis.  The Registration Statement further is materially misleading in that it fails to disclose whether any particular transactions were excluded from what appears to be a relatively small sample of seven transactions and the reasons for that exclusion;

(n)    The Registration Statement is materially misleading in that it fails to disclose the reasons underlying Raymond James' decision to consider premiums paid in twenty-six completed transactions since October 21, 2007 in its Transaction Premiums Analysis.  Specifically, the Registration Statement is materially misleading in that it fails to disclose why Raymond James selected transactions that occurred during a period of unprecedented market turmoil.  The Registration Statement is further materially misleading in that it fails to disclose whether Raymond James or the Board considered the prevailing market circumstances at the time of each constituent transaction's closing, and whether volatile, changing market conditions had any effect on the range of premiums observed in this particular analysis, as these circumstances and conditions may have skewed results downward, thereby making the Proposed Transaction appear more attractive when it otherwise would not appear as such; and

(o)    The Registration Statement is materially misleading in that it fails to disclose the reasons underlying Raymond James' unusual selection of discount rates ranging from 13.75% to 15.25% in its Discounted Cash Flow Analysis.  The Registration Statement further fails to disclose why the spread among these rates is uncharacteristically narrow, especially in light of the Company's current debt load.  Moreover, the Registration Statement is materially misleading in that it fails to explain the reasons Raymond James applied adjusted EBITDA multiples ranging from 5.5x to 7.0x in connection with this analysis, when such multiples appear to be punitively low and thereby have the effect of skewing the results of this analysis in favor of the Proposed Transaction.

52.     Without this information, Company shareholders will be irreparably harmed since they will be deprived of the ability to cast informed, intelligent, and rational votes about whether to vote in favor or against the Merger.

## CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this action individually and as a class action on behalf of all holders of Switch & Data stock who are being and will be harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendants.

54.     This action is properly maintainable as a class action.

55.     The Class is so numerous that joinder of all members is impracticable. According to Switch & Data's SEC filings, as of October 15, 2009 there were over 34 million outstanding shares of Switch & Data common stock, held by hundreds, if not thousands, of beneficial holders.

56.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a)     whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence or due care with respect to Plaintiff and the other members of the Class in connection with the Merger;

(b)     whether the Individual Defendants are engaging in self dealing in connection with the Merger;

(c)     whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Merger;

(d)     whether the Individual Defendants are unjustly enriching themselves and other insiders or affiliates of Switch & Data;

(e)     whether the Individual Defendants have breached any of their other fiduciary duties to Plaintiff and the other members of the Class in connection with the Merger, including the duties of good faith, diligence, honesty and fair dealing;

(f)     whether the Individual Defendants have breached their fiduciary duties of candor to Plaintiff and the other members of the Class in connection with the Merger by failing to disclose all material information concerning the Merger;

(g)     whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

(h)     whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated; and

(i)     whether Switch & Data and Equinix are aiding and abetting the wrongful acts of the Individual Defendants.

57.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

58.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

59.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

60.     Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

61.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I

**Claim for Breach of Fiduciary Duties Against the Individual Defendants**

62.    Plaintiff repeats and realleges each allegation set forth herein.

63.    Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith, candor and independence owed to the public shareholders of Switch & Data and have acted to put their personal interests and the interest of Equinix ahead of the interests of Switch & Data's shareholders.

64.    By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, knowingly or recklessly and in bad faith are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Switch & Data.

65.    Defendants have knowingly or recklessly and in bad faith violated their fiduciary duties by entering into a transaction with Equinix without regard to the fairness of the transaction to Switch & Data's shareholders and by failing to disclose all material information concerning the Merger to such shareholders.

66.    As demonstrated by the allegations above, Defendants knowingly or recklessly failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of Switch & Data because, among other reasons:

(a)    they failed to take steps to maximize the value of Switch & Data to its public shareholders to cap the price of Switch & Data's stock and to give Defendants an unfair advantage, by, among other things, failing to solicit other potential acquirors or alternative transactions;

(b)    they failed to properly value Switch & Data;

(c)    they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Merger; and

(d)    they failed to disclose all material information that would permit Switch & Data's stockholders to cast a fully informed vote on the Merger.

- 25 -

67.     Because Defendants dominate and control the business and corporate affairs of Switch & Data, and are in possession of private corporate information concerning Switch & Data's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Switch & Data which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

68.     By reason of the foregoing acts, practices and course of conduct, Defendants have knowingly or recklessly and in bad faith failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

69.     Unless enjoined by this Court, Defendants will continue to knowingly or recklessly and in bad faith breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the proposed Merger which will exclude the Class from the maximized value they are entitled to, all to the irreparable harm of the Class.

70.     Defendants are engaging in self dealing, are not acting in good faith toward Plaintiff and the other members of the Class, and knowingly or recklessly have breached and are continuing to breach their fiduciary duties to the members of the Class.

71.     As a result of Defendants' unlawful actions, Plaintiff and the other members of the Class will be irreparably harmed in that they will not receive the real value of their equity ownership of the Company. Unless the proposed Merger is enjoined by the Court, Defendants will continue to knowingly or recklessly and in bad faith breach their fiduciary duties owed to Plaintiff and the members of the Class, will not engage in arm's-length negotiations on the Merger terms, and will not supply to Switch & Data's minority stockholders sufficient information to enable them to cast informed votes on the proposed Merger and may consummate the proposed Merger, all to the irreparable harm of the members of the Class.

72.     Plaintiff and the members of the Class have an inadequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

- 26 -

## COUNT II

### Aiding & Abetting the Individual Defendants' Breach of Fiduciary Duty

### (Against Defendants Switch & Data and Equinix)

73.    Plaintiff repeats and realleges each allegation set forth herein.

74.    Defendants Switch & Data and Equinix are sued herein as aiders and abetters of the breaches of fiduciary duties outlined above by the Individual Defendants, as members of the Board of Switch & Data.

75.    The Individual Defendants breached their fiduciary duties of good faith, loyalty, due care and candor to the Switch & Data shareholders by failing to:

(a)    fully inform themselves of the market value of Switch & Data before entering into the Merger Agreement;

(b)    act in the best interests of the public shareholders of Switch & Data common stock;

(c)    maximize shareholder value;

(d)    obtain the best financial and other terms when the Company's independent existence will be materially altered by the Merger Agreement;

(e)    act in accordance with their fundamental duties of good faith, due care and loyalty;

(f)    put the shareholders' best interests above those of the Individual Defendants; and

(g)    disclose all material information concerning the transaction to enable Switch & Data's shareholders to cast informed votes on the Merger.

76.    Such breaches of fiduciary duties could not and would not have occurred but for the conduct of Defendants Switch & Data and Equinix, which, therefore, aided and abetted such breaches via entering into the merger agreement with each other.

77.    Defendants Switch & Data and Equinix had knowledge that they were aiding and abetting the Individual Defendants' breach of their fiduciary duties to the Switch & Data shareholders.

78.     Defendants Switch & Data and Equinix rendered substantial assistance to the Individual Defendants in their breach of their fiduciary duties to the Switch & Data shareholders.

79.     As a result of these Defendants' conduct of aiding and abetting the Individual Defendants' breaches of fiduciary duties, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares and will not be able to cast informed vote with all material information concerning the Proposed Buyout.

80.     As a result of the unlawful actions of Defendants Switch & Data and Equinix, Plaintiff and the other members of the Class will be irreparably harmed in that they will not receive fair value for Switch & Data's assets and business, will be prevented from obtaining the real value of their equity ownership in the Company, and will be voting on the basis of inadequate and incomplete information concerning the Proposed Buyout. Unless the actions of Defendants Switch & Data and Equinix are enjoined by the Court, they will continue to aid and abet the Individual Defendants' breach of their fiduciary duties owed to Plaintiff and the members of the Class, and will aid and abet a process that inhibits the maximization of shareholder value and the disclosure of material information.

81.     Plaintiff and the other members of the Class have no adequate remedy at law.

82.     Plaintiff seeks to obtain a non-pecuniary benefit for the Class in the form of injunctive relief against Defendants. Plaintiff's counsel are entitled to recover their reasonable attorneys' fees and expenses as a result of the conference of a non-pecuniary benefit on behalf of the Class, and will seek an award of such fees and expenses at the appropriate time.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class and against Defendants as follows:

A.     Declaring that this action is properly maintainable as a class action;

B.     Declaring and decreeing that the Merger Agreement was entered into in breach of the fiduciary duties of Defendants and is therefore unlawful and unenforceable;

C.      Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Merger, unless and until the Company adopts and implements a procedure or process to obtain the highest possible value for shareholders;

D.      Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Merger, unless and until the Company provides all material information that is necessary and sufficient for Company shareholders to cast informed, intelligent, and rational votes in favor or against the Merger, and otherwise corrects the materially false and misleading Registration Statement;

E.      Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of Switch & Data's shareholders until the process for the sale or auction of the Company is completed and the highest possible value is obtained;

F.      Rescinding, to the extent already implemented, the Merger or any of the terms thereof;

G.      Implementation of a constructive trust, in favor of Plaintiff, upon any benefits improperly received by Defendants as a result of their wrongful conduct;

H.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

I.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: December 7, 2009

COUGHLIN STOIA GELLER RUDMAN
  & ROBBINS LLP
JONATHAN M. STEIN
Florida Bar No. 009784
STUART A. DAVIDSON
Florida Bar No. 0084824
CULLIN A. O'BRIEN
Florida Bar No. 597341


_____
       CULLIN A. O'BRIEN

120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile: (561) 750-3364

**Attorneys for Plaintiff**

- 30 -

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by U.S. Mail on the following persons on this 17th day of December, 2009:

Louise McAlpin
HOLLAND & KNIGHT
701 Brickell Avenue
Suite 3000
Miami, FL 33131
Telephone: 305-374-8500
305-789-7799 (fax)

*Attorney for Defendants Switch & Data Facilities Company, Inc., Kathleen Earley, George Kelly, William Luby, Arthur Matin, Keith Olsen, G. Michael Sievert, Michael Sileck, and M. Alex White*

Sam J. Salario, Jr.
CARLTON FIELDS
4221 West Boy Scout Boulevard, Suite 1000
Tampa, Florida 33607
Telephone: 813-223-7000
813-229-4133 (fax)

*Attorneys for Sundance Acquisition Corporation and Equinix, Inc.*

_____
Cullin A. O'Brien