IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

| | |
|---|---|
| MICHAEL JIANNARAS, Individually and On Behalf of All Others Similarly Situated, ) | Case No. 09-CA-027950 |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| SWITCH & DATA FACILITIES COMPANY, INC., KATHLEEN EARLEY, GEORGE KELLY, WILLIAM LUBY, ARTHUR MATIN, KEITH OLSEN, G. MICHAEL SIEVERT, MICHAEL SILECK, M. ALEX WHITE, SUNDANCE ACQUISITION CORPORATION, and EQUINIX, INC., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**PLAINTIFF'S MOTION AND INCORPORATED MEMORANDUM OF LAW
IN SUPPORT OF A PRELIMINARY INJUNCTION**

Plaintiff Michal Jiannaras ("Plaintiff"), pursuant to Rule 1.610, Florida Rules of Civil

Procedure, respectfully moves for an order preliminarily enjoining Defendants,[1] and all persons

acting in concert with them, from the taking of a January 29, 2010 vote on the merger of Switch and

Data with and into Equinix *vis-à-vis* Sundance (the "Merger") until the Company's board of

directors (the "Board") makes necessary and appropriate disclosures of material information to

Company stockholders concerning the Merger. In support thereof, Plaintiff states:

---

[1]    Switch and Data Facilities Company, Inc., ("Switch & Data" or the "Company"), Kathleen Early ("Early"), George Kelly ("Kelly"), William Luby ("Luby"), Arthur Matin ("Martin"), Keith Olsen ("Olsen"), G. Michael Sievert ("Sievert"), Michael Sileck ("Sileck"), M. Alex White ("White"), Sundance Acquisition Corporation ("Sundance"), and Equinix, Inc. ("Equinix"), are collectively referred to herein as "Defendants."

- 1 -

I.    **INTRODUCTION**

Plaintiff is a public shareholder of Switch & Data who seeks to ensure that his investment in the Company is not wiped out by the unlawful actions of the Defendants. However, because, as described below, Defendants' actions will cause irreparable harm to Plaintiff and the other public shareholders of Switch & Data, Plaintiff seeks to ***temporarily halt*** the January 29, 2010 shareholder vote concerning the Merger as a result of the failure to disclose material facts concerning the Merger of Switch & Data with Equinix. *See* Red-Line Comparison between the Registration Statements on Form S-4 Dated November 25, 2009 and December 21, 2009, attached hereto as **Exhibit "A."** Indeed, the proposed Merger is the result of a process riddled with self-dealing, disloyal conduct, and a patent a lack of transparency.

Put simply, Plaintiff seeks to enjoin the shareholder vote on the Merger because Defendants have concealed material facts necessary and sufficient to enable Switch & Data shareholders to cast informed, intelligent, and rational votes in favor or against the proposed Merger. These material undisclosed facts include, among many others, the following: a) the assumptions and other underlying data for the analyses of the Company's financial advisor, Raymond James & Associates ("Raymond James"), regarding Raymond James' opinion as to why the Merger maximizes shareholder value or is otherwise fair; b) significant facts and details leading up to the Board's decision to approve of the Merger; and c) details regarding conflicts of interest, compensation, and the involvement of the many financial advisors used by the Company and Equinix. *See* Am. Compl. ¶¶47-49, attached hereto as **Exhibit "B."**

Accordingly, the January 29, 2010 shareholder vote on the proposed Merger must be temporarily enjoined from taking place until Switch & Data shareholders are provided with the material information listed above. Absent such information, the shareholders will be making wholly uninformed decisions as to how to vote their shares. To this end, Plaintiff files the following

- 2 -

memorandum of law in support of Plaintiff's Motion for Preliminary Injunction, and incorporates herein by reference Plaintiff's Amended Direct Shareholder Class Action Complaint Based Upon Self Dealing and Breach of Fiduciary Duty (the "Amended Complaint").

## II.    FACTUAL BACKGROUND

### A.    Switch & Data

Switch & Data is a provider of network-neutral data centers that house, power and interconnect the Internet. The Company operates 34 sites in the United States and Canada. In its data centers, the Company provides network-neutral interconnection and colocation services.

The Company's network-neutral data centers are specifically designed to house the networking and computing equipment its customers use to aggregate and distribute data and digital media content. The Company's network provider customers, who are international carriers and global telecommunications carrier and Internet service providers, include AT&T, Level 3 Communications, ChungHwa Telecom, Singapore Telecommunications, Telecom Italia and Tata Communications. Its content provider customers include Apple, CBS Broadcasting, Google, and Microsoft. Its service provider customers include Adobe, Akamai, Limelight Networks and Verisign.

In February 2007, Switch & Data went public with an initial public offering ("IPO") at $17.00 per share. The Company's stock primarily traded above that level until the global economic recession hit home.

However, Switch & Data has recently performed very well for its investors. Over the past year, Switch & Data's stock has increased 105% from a price of $7.03 per share on October 22, 2008 to $14.40 per share (the closing price prior to the announcement of the Merger):



Switch & Data is well positioned to climb back to pre-recession levels and beyond. For instance, the Company recently issued the following press release announcing its third quarter 2009 financial and operating results:

### Switch and Data Reports Third Quarter 2009 Financial and Operating Results

**Revenue Increased 21%**

**Adjusted EBITDA Increased 51%**

**Secured Incremental $100 million of Financing**

**Following the Quarter, Entered Agreement to be Acquired by Equinix**

**Press Release**

Source: Switch & Data Facilities Company, Inc.

On 4:05 pm EDT, Tuesday October 27, 2009

TAMPA, Fla.--(BUSINESS WIRE)--Switch & Data Facilities Company, Inc. (NASDAQ:SDXC - News), a leading provider of network neutral data center and Internet exchange services, today reported financial results for the three months ended September 30, 2009.

Results of Operations

Total revenues for the third quarter ended September 30, 2009 increased 21.4% to $53.5 million from $44.1 million in the comparable period in 2008. Recurring revenues, which consist of colocation and interconnection services, were $48.8 million in the third quarter 2009, an increase of 17.3% over the same period in the prior year. Non-recurring revenues in the third quarter 2009, representing one time installation fees and services, was $4.7 million in the third quarter 2009, compared to $2.5 million in the comparable period in 2008.

"Business momentum continued in the third quarter" stated Keith Olsen, President and CEO. "Our third quarter results amplify the strength of our operating model and the value we provide to customers. With increasing needs of network centric customers, our broad footprint, carrier densities and access to population centers are key value drivers for our business."

Cost of revenues, excluding depreciation and amortization, for the third quarter 2009 was $25.9 million as compared to $23.7 million for the third quarter 2008. As a percentage of revenues, cost of revenues improved to 48.4% in the third quarter of 2009 from 53.9% in the same period of the prior year.

Sales and marketing costs for the third quarter 2009 were $4.7 million for the third quarter as compared to $4.6 million in the comparable quarter in 2008. General and administrative expenses were $5.1 million for the third quarter as compared to $4.4 million for the third quarter 2008.

Operating income increased 94.2% to $7.3 million in the third quarter of 2009 as compared to $3.8 million in the comparable period in 2008.

Adjusted EBITDA increased 50.5% to $21.0 million in the third quarter of 2009 as compared to $14.0 million in the comparable period in 2008. Adjusted EBITDA margins increased to 39.3% in the third quarter, from 31.7% in the comparable period in 2008. The Company defines Adjusted EBITDA as operating income from continuing operations, plus depreciation and amortization, stock-based compensation expense and other non-cash items such as deferred rent. The Company calculates Adjusted EBITDA margin as Adjusted EBITDA divided by total revenues. A reconciliation between GAAP information and non-GAAP information contained in this press release can be found in the table immediately following the Consolidated Statements of Cash Flow, as well as on the Company's website in the Investor Relations section.

Net income for the period was $2.6 million. Earnings per share was $0.07 per basic and diluted share.

Balance Sheet, Cash Flows, and Business Outlook

The Company had cash and cash equivalents of $22.6 million on September 30, 2009. Bank debt outstanding on September 30, 2009 was $142.5 million. Capital expenditures in the quarter were $15.9 million and $54.3 million year-to-date.

The Company expects the following financial results for 2009:

Total revenues are expected to be $206 million

Adjusted EBITDA is expected to be $76 million

Capital expenditures are projected to be $75 million

Switch & Data does not provide forward-looking guidance for certain financial data, such as depreciation, amortization, net income (loss) from operations, cash generated from operating activities and cash used in investing activities and, as a result, is not able to provide a reconciliation of GAAP to non-GAAP financial measures for forward-looking data. The Company intends to calculate the various non-GAAP financial measures in future periods consistent with the calculation method utilized for the quarter ended September 30, 2009 as presented within this press release.

* * *

Indeed, the Company's second quarter 2009 results were just as positive.  The Company issued the following press release regarding its promising second quarter results:

### *Revenue Increased 17.8% Adjusted EBITDA Increased 32.4% Increased Adjusted EBITDA margin to 38.0%*

**TAMPA, Fla.--(BUSINESS WIRE)**--Jul. 28, 2009-- Switch & Data Facilities Company, Inc. (NASDAQ:SDXC), a leading provider of network neutral data center and Internet exchange services, today reported financial results for the three months ended June 30, 2009.

### Results of Operations

Total revenues for the second quarter ended June 30, 2009 increased 17.8% to $49.4 million from $41.9 million in the comparable period in 2008. Recurring revenues, which consist of colocation and interconnection services, were $47.0 million in the second quarter 2009, an increase of 18.8% over the same period in the prior year. Non-recurring revenues in the second quarter 2009, representing one time installation fees and services, were $2.4 million in the second quarter of both 2009 and 2008.

"Customer demand, improved bookings and increasing margins continues to fuel our business momentum." stated Keith Olsen, Switch and Data President and CEO. Mr. Olsen further commented "our investments coupled with focused execution resulted in solid second quarter results."

Cost of revenues, excluding depreciation and amortization, for the second quarter 2009 was $24.5 million as compared to $21.6 million for the second quarter 2008. As a percentage of revenues, cost of revenues improved to 49.6% in the second quarter of 2009 from 51.7% in the same period of the prior year.

Sales and marketing costs for the second quarter 2009 were $5.2 million for the second quarter as compared to $4.9 million in the comparable quarter in 2008. General and administrative expenses were $4.4 million for the second quarter as compared to $4.3 million for the second quarter 2008.

Operating income increased 12.7% to $4.9 million in the second quarter of 2009 as compared to $4.3 million in the comparable period in 2008.

Adjusted EBITDA increased 32.4% to $18.7 million in the second quarter of 2009 as compared to $14.2 million in the comparable period in 2008. Adjusted EBITDA margins increased to 38.0% in the second quarter, from 33.8% in the comparable period in 2008.

Additionally, the Company's first quarter 2009 results were also promising. The Company issued the following press release regarding its promising first quarter results:

### *Revenue Grew 18.5% EBITDA Increased 31.7% EBITDA Margin Expanded From 31.7% to 35.2%*

**TAMPA, Fla.--(BUSINESS WIRE)--**Apr. 28, 2009-- Switch & Data Facilities Company, Inc. (NASDAQ:SDXC), a leading provider of network neutral data center and Internet exchange services, today reported strong financial results for the first quarter ended March 31, 2009.

"In the first quarter we delivered strong sequential recurring revenue growth and improved margins supported by continued demand for our services," commented Keith Olsen, Switch and Data President and CEO. Added, Mr. Olsen, "Switch and Data posted an overall solid performance."

**First Quarter 2009**

Total revenues increased 18.5% from $39.8 million to $47.1 million in the first quarter of 2009 compared to the same period in 2008. Recurring revenues, which consist of colocation and interconnection services, increased 19.2% over the same period in the prior year to $44.9 million. Non-recurring revenues, representing one time installation fees and services, were $2.3 million in the first quarter 2009, compared to $2.2 million in the same period of the prior year.

EBITDA increased 31.7% from $12.6 million to $16.6 million in the first quarter of 2009 compared to the same period in 2008. EBITDA margins increased from 31.7% to 35.2% in the first quarter of 2009 compared to the same period 2008. (A reconciliation between GAAP information and non-GAAP information contained in this press release can be found in the table immediately following the Consolidated Statements of Cash Flow, as well as on the Company's website in the Investor Relations section.)

- 7 -

Similarly, the Company's annual results for fiscal year 2008 were also very positive for the stockholders. The Company provided the following release,

**2008 Revenue Increased 25% 2008 EBITDA Increased 33% 4Q08 Revenue and EBITDA Increased 22% and 25%**

TAMPA, Fla.--(BUSINESS WIRE)--Feb. 17, 2009-- Switch & Data Facilities Company, Inc. (NASDAQ:SDXC), a leading provider of network neutral data center and Internet exchange services, today reported strong financial results for the three months and for the year ended December 31, 2008.

"In 2008 we delivered strong revenue and EBITDA growth," stated Keith Olsen, Switch and Data President and CEO. "We continue to balance the counteracting dynamics of economic headwinds and strength in market demand. Our outlook for growth in 2009 is centered on continued strength in demand for our services."

**Fourth Quarter 2008**

Total revenues for the fourth quarter ended December 31, 2008 increased 22% to $45.8 million from $37.5 million in the comparable period in 2007. Recurring revenues, which consist of colocation and interconnection services, were $42.9 million in the fourth quarter 2008, an increase of 22% over the same period in the prior year. Non-recurring revenues in the fourth quarter 2008, representing one time installation fees and services, were $2.8 million compared to $2.2 million in the prior year.

EBITDA, which the Company defines as operating income from continuing operations, plus depreciation and amortization, stock-based compensation expense and other non-cash items such as deferred rent, increased 25% to $15.8 million in the fourth quarter of 2008 as compared to $12.7 million in the comparable period in 2007. EBITDA margins increased to 34.6% in the fourth quarter, from 33.8% in the comparable period in 2007.

\*          \*          \*

**Full Year 2008**

For the year ended December 31, 2008 total revenue increased 25% to $171.5 million. Recurring revenue was $161.7 million, an increase of 24% over the comparable period in 2007. For the year ended December 31, 2008, non-recurring revenue was $9.8 million, an increase of 31% over the same period in the prior year.

For the year ended December 31, 2008, cost of revenues, excluding depreciation and amortization, was $90.1 million, up from $71.0 million for the year ended December 31, 2007. As a percentage of revenues, cost of revenues was 52.5% in 2008 as compared to 51.6% in the same period of the prior year. For the year ended December 31, 2008, sales and marketing costs were $19.7 million as compared to $16.3 million for the same period in 2007. For the year ended December 31 2008

general and administrative expenses were $17.7 million as compared to $15.0 million for year ended December 31, 2007.

For the year ended December 31, 2008, EBITDA increased 33% over full year 2007 to $56.6 million from $42.5 million.

Further, based on these stellar results, analysts estimate that Switch & Data will relatively outperform competitors in the industry in earnings substantially in the next five fiscal years.[2]

### B.    The Proposed Merger

On October 21, 2009, after the close of the market, the Defendants issued the following press release that announced the sale of Switch & Data to Equinix:

#### *Equinix Continues to Expand Its Global Service Offering; Extending to New, Customer-driven Markets in North America*

**Foster City, CA and Tampa, FL–October 21, 2009** – Equinix, Inc. (Nasdaq: EQIX), a provider of global data center services, and Switch & Data Facilities Company, Inc. (Nasdaq: SDXC), a leading provider of data center and Internet exchange services, have entered a definitive agreement for Equinix to acquire Switch and Data in a transaction valued at approximately $689 million in cash and stock, based on yesterday's market close. The combination of the two companies will further strengthen Equinix's leadership position in the global data center services market by extending the company's presence to 16 new markets across North America. Equinix will integrate Switch and Data's data center business and operations, including the company's 34 data centers in 22 markets in the U.S. and Canada. The acquisition will add more than one million gross square feet of data center capacity, bringing Equinix's total global footprint to 79 data centers in 34 markets and more than six million square feet across the North American, European and Asia-Pacific markets. It will allow Equinix to immediately expand into new strategic markets, including Atlanta, Denver, Miami, Seattle and Toronto, as well as provide a platform for future expansion of Switch and Data assets.

The acquisition will help the companies' customers respond to two broad market trends. The rapid growth of demand for online information is requiring companies to store and distribute larger volumes of latency sensitive assets and applications at the network edge, near local population centers. At the same time, the market compels companies to develop global aggregation and distribution strategies for their digital assets and applications. The transaction is expected to give Equinix customers

---

2

http://moneycentral.msn.com/investor/invsub/analyst/earnest.asp?Page=EarningsGrowthRates&Symbol=SDXC .

broader access to local markets for their network edge deployments, and Switch and Data customers a comprehensive solution to their global data center needs. The customers of both companies will benefit from a stronger product portfolio and capacity pipeline in a market where demand continues to outpace supply, and from doing business with a partner that brings together the capabilities of two companies with strong reputations for operational excellence and high customer satisfaction.

"The strategic acquisition of Switch and Data by Equinix further strengthens Equinix's position as the most comprehensive global data center services provider across North America, Asia- Pacific and Europe," said Steve Smith, president and CEO of Equinix. "Our complementary business models, coupled with Switch and Data's broad North American market coverage, provide a platform for strong growth as well as an opportunity to accommodate our customers' demands for additional services."

"For more than a decade, Switch and Data has provided colocation and data center services to support the needs of the world's leading online brands," said Keith Olsen, president and CEO of Switch and Data. "These businesses rely on Switch and Data to provide secure locations for them to connect and safeguard their mission-critical applications. The combination of Switch and Data's North American site footprint and Equinix's global reach will increase our addressable market, enhance our customers' value, and drive incremental value to our stockholders."

The parties are targeting completion of the transaction in the first quarter of 2010. The transaction will be subject to customary closing conditions, including the approval of Switch and Data's stockholders and regulatory approvals. The transaction is expected to qualify as a tax-free exchange to Switch and Data's stockholders with respect to the stock portion of the merger consideration. Equinix was advised by J.P. Morgan Securities Inc. and Davis Polk & Wardwell LLP. Switch and Data's lead financial advisor for the transaction was Piper Jaffray & Co., and Deutsche Bank Securities Inc. and RBC Capital Markets served as co-advisors; Switch and Data's legal advisor was Holland & Knight LLP. Raymond James & Associates, Inc. provided a fairness opinion to Switch and Data's Board of Directors with respect to this transaction.

**Financial Terms of the Transaction**

Under the terms of the agreement, Switch and Data stockholders will have the opportunity to elect to receive either 0.19409 shares of Equinix stock or $19.06 in cash for each share of Switch and Data stock. The overall consideration to be paid by Equinix in the acquisition will be 80% Equinix stock, 20% cash. In the event that holders of more than 80% of Switch and Data's stock elect to receive Equinix stock or holders of more than 20% of Switch and Data's stock elect to receive cash, the merger consideration will be pro-rated to achieve these proportions. In addition, a portion of the cash consideration payable to Switch and Data stockholders may be replaced by an equivalent amount of Equinix stock to the extent necessary to enable the transaction to qualify as a tax-free exchange. The cash portion of the merger consideration will be financed through Equinix's existing cash on hand. Switch and Data's directors, executive officers and certain of its significant stockholders have

agreed to vote shares representing 35% of Switch and Data's outstanding stock in favor of the transaction.

* * *

### C.    The Materially False and Misleading Disclosures

On November 25, 2009, and then without substantive changes on December 21, 2009, *see* **Exhibit A**, the Defendants filed Registration Statements on Form S-4 with the U.S. Securities and Exchange Commission ("SEC") that purport to provide Company shareholders with information that is necessary and sufficient to enable the Company shareholders to cast informed, intelligent, and rational votes on whether to approve the Merger. Indeed, the SEC filings purport to explain the Individual Defendants' reasons for consenting to the Merger Agreement, including the background to the negotiation process, as well as the steps taken by the Individual Defendants to assess, evaluate, and eventually enter into the Merger Agreement. However, the purported disclosures contained therein are inadequate and do not provide shareholders with sufficient material information with which to make an informed decision about whether to vote in favor or against the Merger Agreement. These material omissions are set forth in the Amended Complaint, which Plaintiff incorporates herein. *See* Am. Compl. ¶¶47-49.

## III.    ARGUMENT

### A.    Legal Standard for Obtaining Preliminary Injunctive Relief

The purpose of a preliminary injunction is to preserve the *status quo* until a case can be adjudicated on its merits. *Charlotte County v. Vetter*, 863 So. 2d 465, 469 (Fla. 2d DCA 2004) (affirming preliminary injunction "[t]o preserve the status quo"). The "status quo" is defined as "the last peaceable non contested condition that preceded the controversy." *Bailey v. Christo*, 453 So. 2d 1134, 1137 (Fla. 1st DCA 1984). By seeking to enjoin a shareholder vote on an unfair transaction that will forever alter the corporate structure of Switch & Data, Plaintiff is attempting to maintain the

- 11 -

*status quo* pending Defendants' agreeing to uphold their duty of candor to the shareholders and disclose facts which any reasonable stockholder would deem important in deciding how to vote.

The elements necessary for entitlement to a preliminary injunction are: "(1) it will suffer irreparable harm unless the status quo is maintained; (2) there is no adequate remedy at law; (3) the party has a clear legal right to the relief granted; and (4) a temporary injunction will serve the public interest." *Liberty Financial Mortg. Corp. v. Clampitt*, 667 So. 2d 880, 881 (Fla. 2nd DCA 1996). This familiar test is easily adapted to a situation, such as here, where stockholders are being asked to approve a merger based on inadequate, misleading or false information and following an unfair process designed to favor Switch & Data insiders and Equinix, rather than the shareholders.

**B.    Switch & Data Shareholders Have More Than a Substantial Likelihood of Success on the Merits**

**1.    Defendants Have a Duty to Disclose Material Information to Switch & Data's Shareholders Concerning the Proposed Merger**

The Florida courts have consistently relied on Delaware corporate jurisprudence in defining and analyzing Florida corporate law. *See Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1459 n.22 (11th Cir. 1989) ("The Florida courts have relied upon Delaware corporate law to establish their own corporate doctrines"); *Boettcher v. IMC Mortgage Co.*, 871 So. 2d 1047, 1052 n. 5 (Fla. 2d DCA 2004) (same); *Connolly v. Agostino's Ristorante, Inc.*, 775 So. 2d 387, 388 n.1 (Fla. 2d DCA 2000) (same); *Nu Med Home Health Care, Inc. v. Hosp. Staffing Servs., Inc.*, 664 So. 2d 353, 355 (Fla. 4th DCA 1995) ("Florida courts have frequently resorted to Delaware corporate law in construing our own corporation statute."); *In re Se. Banking Corp.*, 855 F. Supp. 353, 359 n.4 (S.D. Fla. 1994) ("Following the lead of the Eleventh Circuit, this Court relies with confidence upon Delaware law to construe Florida corporate law."). Thus, since there is a dearth of Florida law on issues of a director's fiduciary obligations to the company's stockholders, this Court can – and indeed should –

look to Delaware corporate jurisprudence in determining the legal issues in this case. Moreover, Switch & Data is incorporated in the state of Delaware.

In this regard, it is "settled law . . . that corporate directors [must] provide stockholders with 'all material facts within their control that a reasonable stockholder would consider important' in deciding whether to seek appraisal or accept the merger consideration." *Nagy v. Bistricer*, 770 A.2d 43, 59 (Del. Ch. 2000) (quotation omitted). Information is material if:

> [T]here is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote . . . . It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

*Erickson v. Centennial Beauregard Cellular LLC*, C.A. No. 19974, 2003 Del. Ch. LEXIS 38, at *17 (Del. Ch. Apr. 11, 2003) (citing *TSC Indus. v. Northway, Inc.*, 426 U.S. 438 (1976)).

Delaware courts recognize "'the irreversible harm which would occur by permitting a stockholder vote on a merger to proceed without all material information necessary to make an informed decision.'" *In re MONY Group Inc. S'holder Litig.*, 852 A.2d 9, 32 (Del. Ch. 2004). Asking stockholders "*to make a decision as to whether to. . . accept the merger price based upon allegedly inadequate information [creates] the potential for irreparable harm[.]*" *Morton v. Am. Mktg. Indus. Holdings*, C.A. No. 14550, 1995 Del. Ch. LEXIS 162, at *10 (Del. Ch. Oct. 5, 1995). A preliminary injunction "would remedy the wrong caused to the Stockholders' right to cas[t] a vote after a full and fair disclosure of material facts. Because *the necessary supplemental disclosure can be accomplished quickly*[.]" *MONY Group*, 852 A.2d at 32-33. *See also Morton*, 1995 Del. Ch. LEXIS 162, at *9 ("corrective disclosure...is a favored remedy"); *Gilmartin v. Adobe Res. Corp.*, C.A. No. 12467, 1992 Del. Ch. LEXIS 80, at *43 (Del. Ch. Apr. 6, 1992) ("a preliminary injunction

for a brief period to enable the defendants to make corrective disclosure is the remedy most likely to vindicate that right.").

The instant case is no different from the *multitude of Delaware cases* where the courts have enjoined a shareholder vote to require additional facts to be presented to the shareholders before they are asked to vote. *See, e.g., In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171 (Del. Ch. 2007) (enjoining $115 million proposed merger because, *inter alia*, the proxy statement failed to disclose the company's financial projections); *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 112 (Del. Ch. 2007) (enjoining shareholder vote because "[t]he proxy statement fails to disclose the fact that, in late 2006, Lear's CEO Rossiter approached the board expressing a serious concern about whether it was in his best interest to continue as CEO in light of the financial risks that presented."); *La. Mun. Police Employees' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1192 (Del. Ch. 2007) (enjoining shareholder vote on *$23 billion* merger of Caremark and CVS for 20 days, requiring additional disclosures of the structure of fees paid to Caremark's bankers and the right to seek appraisal, and holding that "[s]hareholders would suffer irreparable harm only were they to be forced to vote without knowledge of the material facts relating to the structure of bankers fees and, most importantly, their entitlement to appraisal rights under the transaction as it is presently constructed"); *MONY Group*, 852 A.2d 32-33 (enjoining shareholder vote and requiring additional disclosures regarding amount of change-of-control payments to insiders, and holding that "an injunction would remedy the wrong caused to the Stockholders' right to cast a vote after a full and fair disclosure of material facts. Because the necessary supplemental disclosure can be accomplished quickly, there is no basis to believe that an injunction will result in any harm to MONY or the defendants. In particular, there is no suggestion that the necessity of a short delay in the stockholders meeting poses any threat to the merger proposal, which is not expected to close for several months in any case.

Thus, the balance of hardships tilts decidedly in favor of the entry of an injunction."). Indeed, as the

Chancery Court held in *In re Staples, Inc. S'holders Litig.*, 792 A.2d 934 (Del. Ch. 2001):

> Delaware case law recognizes that an after-the-fact damages case is not a precise or efficient method by which to remedy disclosure deficiencies. A post-hoc evaluation will necessarily require the court to speculate about the effect that certain deficiencies may have had on a stockholder vote and to award some less-than-scientifically quantified amount of money damages to rectify any perceived harm.
>
> Therefore, our cases recognize that it is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected. An injunctive remedy of that nature specifically vindicates the stockholder right at issue-the right to receive fair disclosure of the material facts necessary to cast a fully informed vote-in a manner that later monetary damages cannot and is therefore the preferred remedy, where practicable.

*Id.* at 960.

In addition, in *David P. Simonetti Rollover IRA v. Margolis*, C.A. No. 3694-VCN, 2008 WL

5048692, at *13 (Del. Ch. June 27, 2008), the Chancery Court held:

> As discussed above, stockholders approving the sale of a company, as TriZetto's stockholders are now being asked to do, are entitled to full and complete disclosure of material facts before they vote on a proposed transaction. Indeed, Delaware has an indisputable preference for a fully informed stockholder vote on such matters, and this Court has not hesitated to enjoin transactions pending disclosure of additional material facts. The reason for this is clear: an appropriate post hoc monetary remedy for what amounts to an informational injury is not only difficult to calculate with any meaningful precision, but also it completely undermines the purpose of requiring full disclosure of material facts in the first instance. Although it is theoretically possible to fashion monetary relief in some cases, a breach of the disclosure duty actually results in irreparable harm to the stockholders that is better addressed through an injunctive remedy.

The operative question is whether any of the undisclosed facts are material to the decision

how to vote one's shares. Facts tending to show that the Merger is not entirely fair are critical to that

decision. A shareholder who has enough knowledge about the company and the Board's decision-

making process and thinks the Merger consideration is inadequate may decide not to vote in favor of

the Merger. As discussed below and in the operative complaint, each of the categories of false or

misleading disclosures are important for the purpose of a shareholder's evaluation of whether to vote in favor of the Merger or not.

**2.     Defendants Have Clearly Breached Their Fiduciary Duty of Disclosure**

This requested Preliminary Injunction is absolutely necessary, if for no other reason, than the fact that Switch & Data shareholders have not been provided with full and complete information in the November 25, 2009 and December 21, 2009 SEC filings. Material facts about the fairness of the process and the fairness of the price are necessarily material to the decision whether to vote in favor of a merger or not. At issue in *Morton* were facts about the basis upon which "the common stock merger price was determined," "conflicts of interest" and the discharge of the directors' fiduciary obligations. 1995 Del. Ch. LEXIS 162, at *9. It is well-settled that stockholders are entitled to an accurate description of the "process" used by directors in deciding to support a merger, and the reasons supporting their decision. *Nagy,* 770 A.2d at 60.

A director's fiduciary obligations require them to:

> [E]xercise due care, good faith and loyalty whenever they communicate with shareholders about the corporation's affairs. When shareholder action is requested, directors are required to provide shareholders with all information that is material to the action being requested and "to provide a balanced, truthful account of all matters disclosed in the communication with shareholders."

*McMullin,* 765 A.2d at 925. This standard remains the same regardless of the action sought. *See Skeen,* 750 A.2d at 1174 (refusing to adopt a different disclosure standard when a shareholder is deciding whether to accept appraisal, as opposed to whether to vote for or against something.) Therefore, to state a claim for a disclosure violation, a party must "allege that facts are missing from the [information] statement, identify those facts, state why they meet the materiality standard and how the omission caused injury." *Id.* at 1173.

The other elements of Plaintiff's claim for disclosure are similarly supported by Delaware law and the concept of materiality and completeness in disclosures. Underlying information

- 16 -

concerning the analyses of Raymond James, as detailed in the operative complaint, would similarly provide material information to Switch & Data shareholders being asked to vote and give up all rights as a shareholder in this public company. *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002) ("The real informative value of the banker's work is not in its bottom-line conclusion, but in the valuation analysis that buttresses that result.").

### C.    Switch & Data Shareholders Face Imminent Threat of Irreparable Harm

#### 1.    Money Damages Are Not Sufficient Where Defendants Have Breached Their Duty of Loyalty to Protect the Shareholders

The loss of the opportunity to obtain the highest available value on a sale of the company is well-established as irreparable injury to the public stockholders. *See QVC Network v. Paramount Commc'ns, Inc.*, 635 A.2d 1245, 1273 n.50 (Del. Ch. 1993) ("[s]ince the opportunity for shareholders to receive a superior control premium would be irrevocably lost if injunctive relief were not granted, that alone would be sufficient to constitute irreparable harm"), *aff'd*, 637 A. 2d 34 (Del. 1993); *In re Holly Farms Corp. S'holders Litig.*, C.A. No. 10350, 1988 Del. Ch. LEXIS 164 (Del. Ch. Dec. 30, 1988) (preliminary injunction issued where in its absence, among other things, target's shareholders would lose opportunity to achieve highest value for their shares).

The fact that the highest value available is a monetary concept does not mean that an award of damages will provide an adequate remedy to the shareholders. To warrant injunctive relief, "It is not necessary that the injury be beyond the possibility of repair by money compensation," but only that the threatened injury "be of such a nature that no fair and reasonable redress may be had in a court of law and that to refuse the injunction would be a denial of justice." *State v. Del. State Educ. Ass'n.*, 326 A.2d 868, 875 (Del. Ch. 1974).

Here, the relative difficulty approximating the highest value reasonably available for the shareholders warrants injunctive relief. *See Sealy Mattress Co. v. Sealy Inc.*, 532 A.2d 1324, 1341

(Del. Ch. 1987) ("irreparable harm warranting injunctive relief is appropriate in cases where damages would be difficult to assess"); *accord T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 558 (Del. Ch. 2000). Importantly, a proper process is necessary to determine what actual market forces will bring. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 184 n.16 (Del. 1986).

Further, while Plaintiff submits that the breaches of fiduciary duties by the Switch & Data Board implicate the duties of good faith and loyalty as well as care, *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59 (Del. 1995), an ultimate determination by this Court that breaches were solely of the duty of care could leave Plaintiff without a remedy.

### 2.    Irreparable Harm Based on Inadequate Disclosure of Material Information

Plaintiff has clearly demonstrated that material information has been concealed from Switch & Data shareholders, as outlined above and in the operative complaint. Where there are material omissions, numerous courts have held that injunctive relief is appropriate. *See, e.g., Crawford*, 918 A.2d at 1192 (enjoining shareholder vote on *$23 billion* merger of Caremark and CVS for 20 days, requiring additional disclosures of the structure of fees paid to Caremark's bankers and the right to seek appraisal, and holding that "[s]hareholders would suffer irreparable harm only were they to be forced to vote without knowledge of the material facts relating to the structure of bankers fees and, most importantly, their entitlement to appraisal rights under the transaction as it is presently constructed"); *Staples*, 792 A.2d at 960 ("Delaware case law recognizes that an after-the-fact damages case is not a precise or efficient method by which to remedy disclosure deficiencies. A post-hoc evaluation will necessarily require the court to speculate about the effect that certain deficiencies may have had on a stockholder vote and to award some less-than-scientifically quantified amount of money damages to rectify any perceived harm."); *Gilmartin*, 1992 Del. Ch. LEXIS 80, at *43 ("[t]he right to cast an informed vote is specific, and its proper vindication in this

case requires a specific remedy such as an injunction, rather than a substitutionary remedy such as damages"); *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051 (Del. Ch. 1987) (shareholder's right to make an informed, uncoerced decision requires specific, not substitutional remedy for which damages would be neither meaningful nor adequate); *MONY Group*, 852 A.2d at 32 (issuing preliminary injunction enjoining proposed merger in light of "'irreversible harm which would occur by permitting a stockholder vote on a merger to proceed without all material information necessary to make an informed decision,'" and finding that "an injunction would remedy the wrong caused to the [s]tockholders' right to cas[t] a vote after a full and fair disclosure of material facts"). The material omissions resulting from Defendants' breaches of the duty of candor have left Switch & Data shareholders in the dark regarding the proposed Merger as Defendants have withheld material information necessary for those shareholders to decide how to vote. Injunctive relief, accordingly, must follow.

Likewise, Plaintiff will suffer irreparable injury if the Board's failure to disclose all material facts concerning the proposed Merger goes unchallenged. As discussed throughout this memorandum, the magnitude of the Board's failure to permit a fully-informed vote effectively ensures that Plaintiff and the other Switch & Data shareholders will forever be deprived of the right to decide for themselves whether they wish to vote for or against the proposed Merger. *See State of Wis. Inv. Bd. v. Bartlett*, No. 17727, 2000 WL 193115, at *2 (Del. Ch. Feb. 9, 2000) ("It is important that this Court protect the corporate franchise of . . . shareholders. That franchise can never be more important than when they are asked to vote upon a board approved and recommended merger."). Thus, without all material information being provided to the shareholders, the full extent of damages cannot be calculated.

Further, if the January 29, 2010 shareholder meeting is not enjoined, and the proposed Merger is approved, Plaintiff and the other public shareholders will forever lose their ability to

participate in the growth of Switch & Data *as a stand-alone Company*. There will be little opportunity for the Court to put Plaintiff and the other public shareholders of Switch & Data back into the position they were before the Merger. Once a complex corporate transaction involving a public company is consummated, courts strongly disfavor rescission because of the obvious and substantial difficulties in "'unscramb[ling] the egg[s].'" *See, e.g., In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 728 (Del. Ch. 1999), *aff'd sub nom, Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000). Indeed, in these circumstances, courts have repeatedly voiced a "strong preference" for enjoining a merger prior to it being consummated, rather than trying to "'unscramble the egg[s]'" after a merger is approved. *Med. Imaging Ctrs. of Am., Inc. v. Lichtenstein*, No. 96-0039-B(AJB), 1996 U.S. Dist. LEXIS 22362, at *12 (S.D. Cal. Feb. 29, 1996). As one court noted:

> From the plaintiff's point of view, the imminent threat of the closing of the sale does present a situation where it may be impossible to "unscramble the eggs. . . ." While the remedy of rescission is available . . . it is not difficult to imagine the various obstacles to such a remedy . . . [and with] a potential damage in the neighborhood of $300,000,000, it is doubtful that any damage claim against the directors can reasonably be a meaningful alternative.

*Gimbel v. Signal Cos.*, 316 A.2d 599, 603 (Del. Ch. 1974), *aff'd*, 316 A.2d 619 (Del. 1974). Thus, consideration of this factor also favors granting the injunction.

Simply put, the preliminary injunction Plaintiff seeks would maintain the *status quo*, would ensure that Defendants comply with their fiduciary obligations to the Switch & Data shareholders and would enjoin Defendants from consummating the Merger until they make supplemental disclosures. The benefits of granting preliminary injunctive relief outweigh any possible injury to Defendants, and there are no concerns that either Switch & Data or Equinix will be financially harmed by a postponement of the shareholder meeting.

Indeed, as explained above, the threatened irreparable injury based on the failure of Defendants to disclose material information is inseparable from the nature of the duty of disclosure claim generally. As the court in *MONY Group* held, "Delaware courts 'recognize the irreversible

harm which would occur by permitting a stockholder vote on a merger to proceed without all material information necessary to make an informed decision.' Indeed, 'the irreversible nature of a stockholder vote on a merger supports the argument that any possible harm caused by a tainted voting process would be irreparable.'" *In re MONY Group*, 852 A.2d at 32; *see also Sealy*, 532 A. 2d at 1340 (stating "[i]n this case the inability to make that [voting] choice constitutes irreparable harm, because once having foregone one remedy, the plaintiffs may be unable to obtain the economic equivalent of the others.").

In the instant matter, Plaintiff is left with the untenable choice of having to make an uneducated decision either voting in favor of or against the Merger. This very fact renders this case indistinguishable from *Crawford, MONY, Sealy, Morton,* and *Eisenberg* in that in all cases the plaintiffs are unable to intelligently choose between voting in favor of or against the proposed merger. Therefore, as in those cases, Plaintiff will suffer irreparable harm absent preliminary injunctive relief.

**D.     Switch & Data Shareholders Have No Adequate Legal Remedy**

Courts throughout the nation have long recognized that preliminary injunctions are appropriately granted to prevent corporate officers from breaching fiduciary duties to shareholders and from taking actions that infringe upon the rights of shareholders. *See, e.g., Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 274-75 (2d Cir. 1986) (reversing denial of preliminary injunction where directors did not use reasonable business judgment in connection with lock-up arrangements); *In re Epic Holdings, Inc.*, 985 S.W.2d 41, 46 (Tex. 1998) (discussing the issuance of a temporary restraining order prohibiting consummation of a merger); *Paramount Commc'ns*, 637 A.2d at 36, 50-51 & n.22 (upholding grant of preliminary injunction to prevent consummation of proposed acquisition); *Revlon*, 506 A.2d at 184-85 (affirming grant of preliminary injunction where directors took unconscionable defensive measures in connection with takeover threat);

*Heckmann v. Ahmanson,* 168 Cal. App. 3d 119 (Cal. Ct. App. 1985) (in derivative action, affirming grant of preliminary injunction where plaintiff demonstrated directors breached their fiduciary duties to company and shareholders in connection with planned sale of company); *Schwadel v. Uchitel,* 455 So. 2d 401 (Fla. 3d DCA 1984) (affirming grant of preliminary injunction to prohibit sale of corporate assets by directors); *Remillard Brick Co. v. Dandini,* 117 P.2d 432 (Cal. Ct. App. 1941) (affirming grant of preliminary injunction).

In *Schwadel,* for example, shareholders sought an injunction preventing the CEO of a public company from selling the company's corporate assets for less than fair market value in a transaction that had not been negotiated at arm's length. The Florida trial court granted a preliminary injunction, but thereafter, on a hearing for the issuance of a permanent injunction, dissolved the preliminary injunction. The Third DCA reversed, holding that the preliminary injunction should not have been dissolved. The Court noted that "*[i]njunctive relief is appropriate because . . . legal remedies are inadequate to prevent the irreparable harm that would result from [the CEO's] unilateral decision to change the fundamental nature of the corporate enterprise.*" 455 So. 2d at 404.

Significantly, the *Schwadel* court recognized that the shareholders seeking the injunction *had no "adequate remedy at law," because "[a]n award of damages would not compensate the shareholders for the destruction of the corporation caused by the transfer of the last major corporate asset." Id.* Here, the same rationale applies with even greater force. The transaction would, without question, permanently alter the fundamental nature of the corporate enterprise for Switch & Data.

Although Plaintiff reserves the right to seek all available equitable relief, including rescission and/or rescissory damages in the event the unfair proposed Merger is allowed to proceed, such relief will be less than adequate and can never completely compensate it for: (1) losing his equity position

- 22 -

in Switch & Data as a stand-alone company; and (2) being denied a fair merger process, including the disclosure of all material information. Indeed, to permit the proposed Merger to close without a fair process, including requiring defendants to disclose all material facts to the shareholders would deny the Company's shareholders the right to be treated fairly. *See Roizen v. Multivest, Inc.*, No. 6535, 1982 Del. Ch. LEXIS 544 (Dec. 27, 1982) (granting preliminary injunction seeking to enjoin the consummation of the merger). Because the value of stock ownership of a public corporation and the right to be provided with all material information concerning a merger include more than mere money, and are not truly quantifiable (although clearly ascertainable), only an injunction can prevent the continued breaches of the fiduciary duties of due care, good faith, loyalty, and candor that will occur if the proposed Merger is permitted to go forward.

**E.     The Public Interest Will be Served by Granting Injunctive Relief**

There can be no question that public policy considerations weigh in favor of granting the relief sought by Plaintiff. Plaintiff is a public shareholder of Switch & Data, seeking relief for himself and all other public shareholders of the Company. By this motion, Plaintiff seeks to have the Court maintain the "pre-transaction" status quo by enjoining Defendants – who owe fiduciary duties to the shareholders – from holding a vote of the Switch & Data shareholders in connection with a transaction that is unfair both procedurally and substantively. As described herein, Defendants have, through improper means, agreed to a buyout by Equinix that is not in the best interests of the thousands of Switch & Data shareholders. A preliminary injunction will help assure that Switch & Data's shareholders receive maximum value for their equity and that the integrity of the process is not compromised, and will further ensure that Switch & Data's shareholders make educated, informed votes as to whether to approve the proposed Merger.

**F.    Because Neither Defendants Nor Switch & Data's Shareholders Will be Prejudiced, Only a Minimal Bond, or No Bond Should be Required**

While a bond may be required as a condition of issuance of a preliminary injunction under Fla. R. Civ. P. 1.610(b), it is within the Court's discretion to limit the bond requirement. *Id.* (court required to set a bond "in an amount the court deems proper"); *see also Cushman & Wakefield, Inc. v. Cozart*, 561 So. 2d 368, 369 (Fla. 2d DCA 1990) (noting that court has discretion with regard to amount of bond to be posted by party moving for a preliminary injunction).

Indeed, cases interpreting Rule 65(c) of the Federal Rules of Civil Procedure, which contains the same language as the applicable Florida rule, have held that a court may, in an appropriate case, determine that a bond is completely unnecessary. *See, e.g., Temple Univ. v. White*, 941 F.2d 201, 219-20 (3d Cir. 1991) (equities of potential hardships weighed in favor of waiving bond requirement); *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (holding that court has discretion to determine that security is unnecessary in absence of proof showing likelihood of harm); *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974) (holding that court may dispense with security when there is no proof of likelihood of harm to party enjoined).

In *Crawford*, for example, a case strikingly similar to the instant case, the Delaware Chancery Court enjoined a shareholder vote concerning the *$23 billion* merger between Caremark and CVS due to inadequate disclosures provided to the company's shareholders. The court did not require that a bond be posted, and aptly noted that:

> Caremark shareholders face irreparable harm if they are forced to make their decision without adequate time to consider relevant information revealed by defendants almost upon the eve of a vote. Finally, in considering the balance of equities between plaintiffs and defendants, *it is relevant to note that any wounds to defendants are entirely self-inflicted.*

*La. Mun. Police Employees' Ret. Sys. v. Crawford*, Civil Action Nos. 2635-N, 2633-N, 2007 WL 625006, at *1 (Del. Ch. Feb. 13, 2007); *see also La. Mun. Police Employees' Ret. Sys.*, 918 A.2d at

1192 (again enjoining same multi-billion dollar merger for 20 days for inadequate disclosure problems; no bond required).

Here, it would be patently unfair to require Plaintiff to post more than a minimal bond in an effort to prevent the Company's board, which owes Plaintiff and other Switch & Data shareholders the highest fiduciary duties known under the law, from violating such fiduciary duties. In fact, given that the requested injunction actually benefits Defendants in their capacity as directors of Switch & Data – by ensuring that they are in compliance with their fiduciary obligations under law, Defendants cannot prove any harm here, much less a harm that outweighs the harm to the shareholders if an injunction is not issued. *See, e.g., MONY Group*, 852 A.2d at 32-33 (issuing preliminary injunction enjoining proposed merger in light of "'irreversible harm which would occur by permitting a stockholder vote on a merger to proceed without all material information necessary to make an informed decision,'" and finding that "an injunction would remedy the wrong caused to the [s]tockholders' right to cas[t] a vote after a full and fair disclosure of material facts"). As discussed above, the proposed injunction only prevents Defendants from continuing to breach their fiduciary duties to Switch & Data's shareholders.

In addition, it would be unfair to require Plaintiff, an individual shareholder of Switch & Data, to post a bond in an effort to prevent Switch & Data's directors, who owe Plaintiff and other Switch & Data shareholders the highest fiduciary duties known under the law, from violating such fiduciary duties.

However, in the event the Court is inclined to require the posting of a bond, under the circumstances, Plaintiff respectfully requests that the bond be nominal. *See, e.g., In re MONY Group, Inc. S'holder Litig.*, No. 20554-NC, Bond (Del. Ch. Mar. 2, 2004) (bond in the amount of $5,000 imposed in connection with the injunction of $1.5 billion merger); *In re Pure Res., Inc. S'holder Litig.*, No. 19876, Order on Plaintiffs' Motion for Preliminary Injunction (Del. Ch. Oct. 3,

2002) (bond in the amount of $5,000 imposed in connection with the injunction of $550 million tender offer); *ODS Techs., L.P. v. Marshall*, 832 A.2d 1254 (Del. 2003) (ordering plaintiff post a secured bond in the amount of $5,000 after granting a shareholder's motion to enjoin a shareholder vote due to a materially misleading proxy statement); *Solar Cells, Inc. v. True N. Partners, LLC*, No. 19477, 2002 Del. Ch. LEXIS 38, at *28 (Del. Ch. Apr. 25, 2002) (ordering plaintiff-shareholder to post a $2,500 bond in connection with issuance of preliminary injunction enjoining merger).

## IV.    CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that the Court grant this motion and preliminarily enjoin Defendants and all persons acting in concert with them from the taking of a vote on the Merger until the Company's Board makes necessary and appropriate disclosures of material information to the Switch & Data stockholders concerning the Merger, and granting such other and further relief as the Court deems just and proper.

DATED: January _8_, 2010

COUGHLIN STOIA GELLER RUDMAN
    & ROBBINS LLP
JONATHAN M. STEIN
Florida Bar No. 009784
STUART A. DAVIDSON
Florida Bar No. 0084824
CULLIN A. O'BRIEN
Florida Bar No. 597341


CULLIN A. O'BRIEN

120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile: (561) 750-3364

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by e-mail and

U.S. Mail on the following persons on this 8th day of January, 2010:

Michael L. Chapman
HOLLAND & KNIGHT LLP
100 N. Tampa Street, Suite 4100
Post Office Box 1288
Tampa, FL 33601-1288
Telephone: 813-227-8500
813-229-0134 (fax)
michael.chapman@hklaw.com

Louise McAlpin
HOLLAND & KNIGHT LLP
701 Brickell Avenue
Suite 3000
Miami, FL 33131
Telephone: 305-374-8500
305-789-7799 (fax)
louise.mcalpin@hklaw.com

*Attorney for Defendants Switch & Data
Facilities Company, Inc., Kathleen Earley,
George Kelly, William Luby, Arthur Matin,
Keith Olsen, G. Michael Sievert, Michael
Sileck, and M. Alex White*

Sam J. Salario, Jr.
Kevin P. McCoy
CARLTON FIELDS
4221 West Boy Scout Boulevard, Suite 1000
Tampa, Florida 33607
Telephone: 813-223-7000
813-229-4133 (fax)
ssalario@carltonfields.com
kmccoy@carltonfields.com

Neal A. Potischman
Samantha Harper Knox
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, CA 94025
neal.potischman@davispolk.com

*Attorneys for Sundance Acquisition
Corporation and Equinix, Inc.*

_____
Cullin A. O'Brien