IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| BROADBASED EQUITIES, ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED,<br><br>PLAINTIFF,<br><br>VS.<br><br>KEITH OLSEN, WILLIAM LUBY, KATHLEEN EARLEY, GEORGE KELLY, ARTHUR MATIN, G. MICHAEL SIEVERT, MICHAEL SILECK, M. ALEX WHITE, SWITCH AND DATA FACILITIES COMPANY, INC. AND EQUINIX, INC.,<br><br>DEFENDANTS. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO.<br>8:09-CV-02473-RAL-TBM |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

Defendants Keith Olsen, William Luby, Kathleen Earley, George Kelly, Arthur Matin, G. Michael Sievert, Michael Sileck, M. Alex White (the "Individual Defendants") and Switch and Data Facilities Company, Inc. ("Switch and Data" or the "Company") move for an order pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA" or the "Reform Act"), dismissing Plaintiff's Complaint for failure to state a claim upon which relief can be granted and failure to state a claim with particularity.

## I.    INTRODUCTION

This is an action for an injunction in which a single stockholder attempts to prevent a shareholder vote scheduled for January 29 on a proposed merger that was negotiated at arm's length for over six months and that will result in a 33.9% premium to

Company shareholders (the "Merger"). Plaintiff seeks to prevent the Merger between the Company and Equinix, Inc. on the basis of bare-bones allegations that (1) the Company's December 21, 2009 Proxy Statement (the "Proxy Statement") filed with the Securities and Exchange Commission ("SEC") omitted material facts such that a shareholder vote would be uninformed; and (2) the Individual Defendants, as Company directors, breached their fiduciary duties of care, loyalty, good faith and candor by failing to maximize the consideration received for the Company.

Plaintiff's claims must be dismissed in their entirety for their failure to state a claim and pleading deficiencies. The first claim for relief ("Count 1") purports to state an action under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against the Defendants. Count 1 should be dismissed because it fails to satisfy the PSLRA's heightened pleading standards and is premised upon the supposed duty to disclose immaterial details regarding the merger negotiations that the Company is not required to disclose. The fiduciary duty claims in the second and third claims for relief ("Counts 2 and 3") also suffer fatal deficiencies. Contrary to Plaintiff's claims, the Individual Defendants were under no obligation to maximize the merger consideration and their actions are protected under the business judgment presumption of appropriateness. The Individual Defendants obtained the highest possible consideration through arm's length negotiations and by following well-established corporate procedures that resulted in a well-informed business decision. Plaintiff's second-guessing and conclusory allegations are insufficient to disrupt the sound corporate process that controlled the Merger negotiations.

## II.    BACKGROUND

### A.    The History of the Merger

The Individual Defendants are the eight members of the Company's Board of Directors (the "Board") who approved the Merger. In April 2009, the Board became involved with negotiations regarding a proposed transaction between Switch & Data and a privately held firm in its industry outside of the United States (the "International Party"). (Proxy Statement (attached hereto as Exhibit A) at 29)[1].   Later that month, Equinix expressed an interest in the Company and by May 2009 the Board had authorized its officers to continue discussions with both interested parties.  (Proxy Statement at 29). In the six months that followed, the Board met, either in person or telephonically, on twenty-one separate occasions to consider the status of negotiations, analyze proposed terms, consider strategic alternatives and assess the Company's business and future prospects. (Proxy Statement at 30-37).  The Board was prompt to react to developments - - meeting within a day after any proposal was submitted to the Company.  (Proxy Statement at 31-35, 37).  During the negotiations, the Board, Company officers or their representatives met with representatives of the interested parties on at least thirty-two occasions to conduct due diligence and negotiate the terms and structure of the contemplated business combinations. (Proxy Statement at 29-37).

---

[1] On this motion, the Court may take judicial notice of the Company's filings with the SEC. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 (11th Cir. 1999) ("relevant documents legally required by and publicly filed with the SEC at the motion to dismiss stage" may be judicially noticed by district court); *see also Stahl v. U.S. Dep't of Agriculture*, 327 F.3d 697, 700 (8th Cir. 2003) (district court may take judicial notice of public records and may consider them on motion to dismiss).

### B.    The Board Was Well-Informed

The members of the Board, many of whom are officers of other successful businesses, were guided by their own experience and competent financial and legal advisors.  The Individual Defendants repeatedly consulted outside legal counsel with respect to the proposed business combinations, their fiduciary obligations, the Merger Agreement and other legal aspects of the process.   The Individual Defendants received advice and analyses from three different reputable financial advisors (Piper Jaffray, Deutsche Bank and Royal Bank of Canada), the earliest of which was retained in July 2009, four months before the Board approved the Merger.  (Proxy Statement at 30, 36, 37).  The financial advisors provided financial and valuation analysis during negotiations, conducted due diligence and met with Equinix's financial advisors.  (Proxy Statement at 30-38).

The Board analyzed each proposed business combination.  (Proxy Statement at 32-37).  It considered each interested party, their respective businesses and prospects for opportunity and growth. (Proxy Statement at 32-37). The Board weighed the benefits and risks of each proposed business combination, including synergies, business opportunities, prospects for success and risks to the combined entity.  (Proxy Statement at 38-39).  The Board carefully assessed the adequacy of consideration in light of its own experience, its judgment of the value of the Company and the advice of various financial advisors.  (Proxy Statement at 38).   The Board also considered alternatives to the proposals, such as remaining a stand alone company (an alternative still available to the

stockholders) and the likelihood of other interested parties or a higher offer. (Proxy Statement at 32, 38-39).

Rather than pursuing a transaction with the International Party or seeking further interest from others in the industry, the Board decided to pursue the Merger with Equinix. Its decision to no longer pursue a proposed combination with the International Party was based on its conclusion that a "transaction with the International Party was unlikely to result in value to Switch and Data's stockholders equal to or greater than the proposed transaction with Equinix." (Proxy Statement at 35). As to other industry participants, the Board relied upon the "significant premium offered by Equinix, the knowledge of the strategies and the financial conditions of the participants in the industry and the risk of delay imperiling the proposed Equinix transaction." (Proxy Statement at 35-36).

### C.    The Merger Consideration

The Board directed negotiations to obtain the highest possible consideration for Switch & Data. Even though Equinix's initial offer of $16.35 represented a 20% premium over the Company's share price at the time, the Board deemed the offer insufficient and instructed the Company's officer to notify Equinix that a higher offer was required. (Proxy Statement at 32). The Board also directed the Company's officers to continue to pursue the International Party transaction. (Proxy Statement at 33). Equinix then indicated it was not willing to increase its offer and urged the Company to make a counterproposal, but the Company refused. (Proxy Statement at 32). Three weeks later, Equinix increased its offer to $18.50, a 27% premium to the Company's

share price at the time. (Proxy Statement at 33). Believing the new offer was still too low, the Board directed a counterproposal of $19.47. (Proxy Statement at 33). Equinix then countered with a third offer of $18.80 (a 30% premium to the Company's share price on the day of the offer), which it revised the next day to $18.46 (a 30.3% premium to the Company's share price, which had decreased from the prior day's offer). (Proxy Statement at 34-35).

After further discussions over the course of a month, Equinix increased its offer to the final Merger consideration of $19.06, which represents a 33.9% premium to the Company's October 20, 2009 closing price. (Proxy Statement at 38). The Merger consideration will be paid in 80% Equinix stock and 20% cash, representing an approximate 12.12% ownership interest in Equinix that will allow the former Company stockholders to participate in the growth of the surviving entity which will include the Switch & Data business. (Proxy Statement at p. 38). The Board received a fairness opinion from Raymond James & Associates, Inc. ("Raymond James"), indicating that the merger was fair to Company stockholders from a financial perspective. (Proxy Statement at 37).[2] On October 21, 2009, the Company announced the Merger. Since that time, Switch & Data has not received any offer from another interested party, much less one which is superior to the consideration in the Merger.

---

[2] Notably, the fee paid to Raymond James was not contingent upon its issuance of the fairness opinion.

**D.    The Company's Disclosures**

The Proxy Statement contains all material information regarding the Merger.  It consists of 107 pages of information and disclosures, the Merger Agreement (Annex A), the Voting Agreement (Annex B), the Fairness Opinion (Annex C) and the text of Section 262, Delaware Corporation Law (Annex D).  The Proxy Statement provides detailed information regarding, among other things: the merger negotiations (over nine pages); the Board's reasons for approving the Merger (two pages); the terms of the Merger and a summary of the Merger Agreement (11 pages); a summary of the fairness opinion and underlying financial and valuation analysis (over six pages); and projected financial information for the combined entities (over three pages).  *See* Proxy Statement at 29-38, 38-39, 1-11, 41-47 and 47-50, respectively).  The Proxy Statement also clearly discloses the potential risks to Switch and Data's stockholders if the Merger is consummated.  Despite, these robust disclosures, Plaintiff claims, among other things, that the Proxy Statement is insufficient and misleading.

### III.    MEMORANDUM OF LAW

**A.    Count 1 Fails to State a Cognizable Claim Under Section 14(a) of the Securities Exchange Act**

The PSLRA imposes a heightened pleading standard on claims, such as Count 1 here, brought under Section 14(a) of the Securities Exchange Act.  *See* 15 U.S.C. § 78u-4(b)(1); *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp..,* 394 F.3d 126, 144 (3d. Cir. 2004) (applying PSLRA particularity standards to Section 14(a) claim); *In re Premiere Techs. Inc.,* 2000 WL 33231639, at * 8 (N.D. Ga. Dec. 8, 2000).  A plaintiff alleging a Section 14(a) claim is required to "specify each statement alleged to have been

misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1); *In re U.S. West, Inc. Sec. Litig.*, 3003 WL 21246539, at *2 (3d Cir. May 30, 2003). This heightened pleading requirement "imposes another layer of factual particularity" to federal securities actions and "requires a Plaintiff to set forth specific details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading." *In re Rockerfeller Center Props.*, 311 F.3d 198, 217 (3d Cir. 2002); *see also Little Gem Life Sciences LLC v. Orphan Medical, Inc.*, Civil No. 06-1377, 2007 WL 541667, at *3 (D. Minn. Feb. 16, 2007). A complaint alleging a violation of Section 14(a) which fails to satisfy the PSLRA's heightened pleading requirements must be dismissed as a matter of law. *See In re Rockerfeller Center Props.*, 311 F.3d at 216 (dismissing action for failure to sufficiently plead Section 14(a) claim, holding that "bald assertions or legal conclusions" or "legal conclusions draped in the guise of factual allegations" will not suffice.).

In addition to meeting the PSLRA's pleading requirements, a Plaintiff seeking to state a claim under Section 14(a), must also plead specific facts showing that the Proxy Statement contained a <u>material</u> misrepresentation or omission. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1329 (3d Cir. 2002). An omission is material if it "has a significant propensity to affect the voting process" or if there is a "substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (applying materiality standard to Section 14(a)); *see Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir.

2007) (same); *Abramson v. Nytronics, Inc.* 312 F.Supp. 519, 524 (S.D.N.Y. 1970) (defining material facts as "facts of such a nature that they could normally be expected to lead a reasonable stockholder not to vote in favor of the proposal set forth in the material"). Thus, to survive dismissal of its Section 14(a) claim, a plaintiff:

> . . . must provide some basis for a court to infer that the alleged violations were material. For example, a pleader must allege that facts are missing from the statement, identify those facts, state why they meet the materiality standard, and how the omission caused injury.

*Malpiede v. Townson*, 780 A.2d 1075, 1087 (Del. 2001) (quoting *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 142 (1997)).

A proxy statement, like the one here, that provides a full and fair characterization of the background of a merger transaction is not actionable under Section 14(a). *See Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1199-1200 (2d Cir. 1978) (finding proxy statement did not violate Section 14(a) where it "conveyed a sufficiently accurate picture so as not to mislead."). Indeed, courts have repeatedly held that to escape liability, proxy statements need not include every detail of merger negotiations:

> To vote on [an] offer, the shareholders need[] to know the offer's details and why the board approved it. . . . [T]hey [do] not need to know the negotiating history of how the board reached its decision to approve the transaction. That information is not material to the final offer and invites disclosure of irrelevant, possibly contradictory, and most probably confusing information."

*Brown v. Perrette*, 1999 WL 342340, at *8 (Del. Ch. My 14, 1999) (granting motion to dismiss shareholder class action); *see also Lane v. Page*, 581 F. Supp.2d 1094, 1125 (D.N.M. 2008) (granting motion to dismiss class action challenging merger transaction,

finding "[a] proxy statement need not reveal every detail involved in a transaction; it only needs to paint a sufficiently accurate picture so as not to mislead."); *Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *14 (Del. Ch. Nov. 30, 2007) (a proxy statement is not required to "give its shareholders a play-by-play description of merger negotiations.") (internal citation omitted); *Vornado, Inc. v. Interstate Props.*, 470 F. Supp. 714, 719 (S.D.N.Y. 1979) ("Section 14(a) does not establish minimum standards of specificity for proxy statements.  It simply requires that the statements contained proxy statements be accurate.").

Here, the Proxy Statement provides a detailed description of all material aspects of the Merger negotiations, including the dates and locations of specific meetings, names of the individuals who attended the meetings, summaries of the topics discussed; terms of the offers; and the reasons underlying the Board's decisions. *See* Proxy Statement at 29-38. The Proxy Statement lists more than fifty separate meetings and discussions that took place over the course of ten months with various parties, including Equinix, the International Party, the Board, and the Company's financial and legal advisors.  It also includes over nine pages of disclosures regarding the background of the Merger and another three pages of disclosures devoted to the Company's reasons for the Merger. (*See* Proxy Statement at 29-40).

Despite the extensive disclosures on all material aspects of the Merger, Plaintiff generally alleges that the Proxy Statement is actionable under Section 14(a) because it fails to disclose minutiae regarding the background of the Merger and the possible transaction with the International Party such as:

- specifics of discussions about the International Party transaction, its valuation and a comparison to the Equinix Proposal (Compl. ¶40(i),(ii),(iii));

- details of conversations with financial advisors about a valuation range that <u>might</u> be achieved in further negotiations with Equinix (Compl. ¶ 40(iv));

- the financial advisors' views on value expressed to Equinix's financial advisors or the Board (Compl. ¶ 40(v), (vi) and (ix)); and

- the basis of a counteroffer not accepted by Equinix. (Compl. ¶ 40(vii).

Plaintiff is wrong. Its Complaint neither satisfies the PSLRA's heightened pleading standards, nor sufficiently alleges the materiality of the purported omissions in the Proxy Statement. Notably absent from the Complaint are: any explanations as to <u>why</u> knowing the play-by-play details of these discussions (discussions which are fully disclosed in the Proxy Statement) would affect the shareholders' voting process; or the reasons why each of the purported omissions are misleading. *In re CheckFree Corp. S'holders Litig.*, Case No. 3193-CC, 2007 WL 3262188, at *2 (Del. Ch. Nov. 1, 2007) ("Plaintiffs cannot simply allege that the background [of the merger] section is lacking; they must explain *what* is lacking.") (emphasis in original). Indeed, the specifics of discussions about the International Party transaction, its valuation and a comparison to the Equinix proposal that Plaintiff contends are actionable omissions cannot possibly be material because the shareholders will not be voting on a transaction with the International Party. *See, e.g., Brown v. Perrette*, 1999 WL 342340, at *10 (granting motion to dismiss shareholder class action under Section 14(a), finding proxy statement need not disclose information regarding director's opinion as to intermediate offer

because a "director's opinion as to intermediate steps of an offer before it was finalized and approved unanimously are immaterial to the shareholders' approval of the final offer.").

Nor do the details of conversations with financial advisors about a valuation range that <u>might</u> be achieved in further negotiations with Equinix (Compl. ¶ 40(iv); the financial advisors' views on value expressed to Equinix's financial advisors or the Board (Compl. ¶ 40(v), (vi) and (ix)); or the basis of an unaccepted counteroffer by Equinix (Compl. ¶ 40(vii)) constitute material facts to support a claim that the Proxy was insufficient or misleading.[3] None of these cited details are material for the simple reason that they do not relate to the final offer or its valuation analysis, which was fully disclosed in Proxy Statement and in the fairness opinion. Views expressed by financial advisors on the amount Equinix <u>might</u> pay has nothing to do with a shareholder vote on the consideration Equinix <u>actually</u> agreed to pay. *See In re CheckFree*, Case No. 3193-CC, 2007 WL 3262188, at *2 ("[a] disclosure that does not include all financial data needed to make an independent determination is not . . . *per se* misleading or omitting a

---

[3] Plaintiff's stated reason for seeking this additional information is because "[i]nformation regarding how the board complied with its fiduciary duties is <u>relevant</u> to shareholders in determining whether to vote in favor of the Sale Agreement." Compl. ¶ 40(i)-(ix) (emphasis added). This allegation demonstrates, on its face, Plaintiff's misunderstanding of the law because merely "relevant" information does not meet the requisite standard of materiality. "If every piece of arguably relevant information needed to be disclosed in a proxy statement, investors and shareholders would be flooded with information and the purposes of disclosure would be defeated." *Lane*, 581 F. Supp.2d at 1125; *see also Brown*, 1999 WL 342340, at *10 (Del. Ch. My 14, 1999) ("the proxy is not a record of what took place in the board meetings, but is a legal document assembled by [a company] to meet its obligation to share information gathered from various sources with [its] shareholders."); *In re CheckFree Corp. S'holders Litig.*, 2007 WL 3262188, at *2 (Del. Ch. Nov. 1, 2007) (finding disclosure requirements "are not boundless" and that "[i]t is not sufficient that information might prove helpful; to be material it must 'significantly alter[ ] the total mix of information made available.'"). Because the Complaint fails to show that the additional information sought would have significantly altered the total mix of information, rather than merely been more helpful, Plaintiffs Section 14(a) claim must be dismissed.

material fact. The fact that the financial advisors may have considered certain non-disclosed information does not alter this [materiality] analysis.") (emphasis in original). Likewise, the interim opinions of the Company's financial advisors expressed at various times during the offer and counteroffer process are the type of preliminary information that courts have repeatedly held to be immaterial and inappropriate in a proxy statement. *See Lane*, 581 F. Supp.2d at 1125 (finding failure to disclose internal valuation immaterial because "[n]ot every internal opinion circulating in a corporation needs to be disclosed in a proxy statement" and "[v]aluations and appraisals that lack sufficient indicia of reliability are commonplace in business, and such speculation is not the kind of information upon which a reasonable person would rely."); *In re 3Com S'holders Litig.*, Case no. 5067-CC, 2009 WL 5173804, at *3, 6 (Del. Ch. Dec. 18, 2009) (finding proxy statement is "more accessible to investors" where it discloses summaries of financial information relied on in connection with merger instead of full versions of already disclosed projections, and that proxy statement need only "accurately describe" the valuation work performed by financial advisor); *Wayne County Employees' Retirement Sys. v. Corti*, 954 A.2d 319, 330 (Del. Ch. 2008) (finding "the fact that something is included in materials that are presented to a board of directors does not, ipso facto make that something material. Otherwise every book that's given to the board and every presentation made to the board would have to be part of the proxy material that follows the board's approval of a transaction. That certainly is not the law.") (internal citation omitted). Thus, because the supposed omissions cited by the Plaintiff are immaterial and

Plaintiff has otherwise failed to sufficiently plead a claim under Section 14(a), Count 1 should be dismissed as a matter of law.[4]

**C.      Plaintiff Has Failed to State a Claim Under Delaware State Law**

Counts 2 and 3 are premised on alleged breaches of the fiduciary duties of care, good faith, loyalty and candor.  In these counts, Plaintiff primarily contends that Switch & Data and the Individual Defendants are liable for: allowing certain provisions in the Merger Agreement that effectively ensure a sale to Equinix; and approving the Merger without maximizing the Merger consideration.  (Compl. ¶¶ 36, 38, 46-49).  Contrary to Plaintiff's contentions, the Defendants are not liable for any alleged breaches because their approval of the Merger is protected under the business judgment presumption of appropriateness.

The Individual Defendants implemented a thorough decision-making process that resulted in an informed business decision to approve the Merger.  If the Merger is consummated, Switch & Data stockholders will receive a substantial premium for their Company shares.   The Complaint contains no basis to disregard the Individual Defendants' informed business judgments in approving the Merger.   Conclusory allegations, speculation and second-guessing like that included in the Complaint, have been repeatedly rejected under Delaware law as substitutes for the type of sound corporate decision-making engaged in by the Board here.[5]

---

[4] Count 3, Plaintiff's claim for purported violations of the duty of candor under Delaware state law, should likewise be dismissed for the same failure to allege any material omission in the Proxy Statement.

[5] The Complaint asserts supplemental jurisdiction under 28 U.S.C. § 1367 as the basis for the Court's subject matter jurisdiction over the state law claims (Compl. ¶ 2).  Because Plaintiff has failed to state a

1.     **The Business Judgment Rule Protects the Individual Defendants'**
       **Decision to Approve the Merger**

Under Delaware law, there is a presumption that the Individual Defendants exercised due care and acted in good faith in entering the Merger Agreement. *See Aronson v. Lewis*, 473 A.2d 803, 812 (Del. 1984). The duty of due care required the Individual Defendants "to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the offer to the stockholders." *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. 1985); 8 Del. C. §251. Liability for breaching the duty of due care is "predicated upon concepts of gross negligence." *Aronson*, 473 A.2d at 812. To survive the presumption of the business judgment rule, a plaintiff must plead facts that do more than question the reasonableness or appropriateness of the board's actions. *See McMillan v. Intercargo Corp.*, 768 A.2d 492, 505 n. 56 (Del. Ch. 2000). Instead, the complaint must include facts from which a court could find that the lack of care is "egregious." *Id.* Because the Complaint does not include any such facts, Plaintiff's state law claims in Count 2 and 3 fail as a matter of law.

As required under Delaware law, the Individual Defendants followed a thorough and well-informed process in negotiating and approving the Merger. *See, e.g., Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 985-86 (Del. Ch. 2000); *In re Wheelaborator Tech. Inc. S'holder Litig.*, No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992). Over the course of over five months, the Individual Defendants met 14 times, either in person or telephonically, to discuss the proposals, the status of negotiations and

---

claim under Section 14(a), the Court should also dismiss the state law claims for lack of supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(3).

the results of due diligence. The Individual Defendants received advice and financial analysis from Company officers and financial advisors regarding the value and business prospects of the Company, proposed transactions, and the financial risks and benefits of each proposal. The Board also consulted outside counsel on legal aspects of the proposals as well as their fiduciary duties. The Board considered alternatives to the proposed transactions, including remaining as a stand alone entity or seeking higher offers from other industry participants. The Board also considered the fairness opinion issued by Raymond James, which determined that the Merger price is fair to Switch & Data's shareholders. Against this backdrop of the Board's well-informed and deliberate process in considering, over an extended period, all possible business combinations and opportunities for Switch & Data, the Complaint's allegations fail to show gross negligence.

Plaintiff also tries to substantiate its state law claims by alleging the Individual Defendants are liable for approving four provisions in the Merger Agreement ("Contractual Provisions") that supposedly benefitted Equinix to the detriment of Company shareholders. Such Contractual Provisions, however, which are uniformly found acceptable under Delaware law, cannot provide the basis for Plaintiff's state law claims.

Plaintiff claims that a Voting Agreement and Non-Solicitation clause improperly ensure the merger with Equinix.[6] Plaintiff fails to mention that the Merger Agreement is

---

[6] Plaintiff also alleges that the Individual Defendants "appear to have focused their negotiating efforts on Equinix ..." (Compl. ¶47). This is inaccurate. The Company negotiated with the International Party for nine months beginning in January 2009. The Individual Defendants' efforts in this nine-month period make clear that negotiations with Equinix did not sidetrack discussions with the International Party. In fact, the

subject to an exception that permits the Company to consider a higher offer from a third party. *See* Merger Agreement (attached to Proxy statement at Annex A) §6.2. The exception is typically referred to as a "fiduciary-out provision" and it, as well as the 3.9% termination fee and the matching provision that Plaintiff challenges, have been found to be acceptable under Delaware law. *See, e.g., In re 3Com S'holders Litig.*, 2009 WL 5173804 (Del. Ch. Dec. 18, 2009) ("Plaintiffs here fail to explain how [the no solicitation provision, the matching rights provision, and the termination fee] would prevent another bidder from making a competing offer in this case."); *In re Toys "R" Us, Inc. S'holders Litig.*, 877 A.2d 975, 1017 (Del. Ch. 2005) ("[N]either a termination fee nor a matching right is *per se* invalid. Each is a common contractual feature that, when assented to by a board fulfilling its fundamental duties of loyalty and care for the proper purpose of securing a high value bid for the stockholders, has legal legitimacy.").

More importantly, Plaintiff does not allege that the negotiations with Equinix were not at arm's length. Equinix proposed each of the challenged provisions and the Company attempted to eliminate or modify them in negotiations. Equinix increased its consideration and compromised on other points, but it would not agree to eliminate the Contractual Provisions. Significantly, Plaintiff has failed to provide any well pled facts demonstrating that the Company could have obtained more favorable terms from Equinix. Under these circumstances, Delaware law requires no more of the Individual

---

Board instructed management to continue to negotiate with the International Party, even after Equinix made and increased its offers. In total, management met with the International Party (and its advisors) ten times after Equinix first expressed interest, even meeting with the International Party and Equinix on the same day. The Company's pursuit of the International Party business combination continued to the day the Company executed a 21-day exclusivity agreement with Equinix.

Defendants and it is up to Company stockholders to determine if the provisions are acceptable in the context of the entire transaction.[7]

> **2.     Revlon Does Not Apply to This Transaction, But Even if it Did, the Individual Defendants Completely Fulfilled All Applicable Duties**

Plaintiff also alleges that the Individual Defendants are liable under Delaware law for failing to maximize the Merger consideration.    According to the Complaint, the Company was sold "on the cheap" or for an insufficient premium in light of the Company's growth prospects and the potential merger synergies.[8]  (Compl. ¶¶36, 38, 39, 47, 48,49).  As demonstrated below, Plaintiff misapprehends the applicable legal standard and its conclusory and unsupported assertions about price are directly contradicted by the facts described in detail in the proxy.

Under Delaware law, corporate fiduciaries have the duty to maximize the sale consideration in a change of control transaction (referred to hereinafter as the "*Revlon* duty").  *See Revlon v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del.

---

[7] The Complaint references the duty of loyalty but it contains no allegations to support a breach of any such duty. Nevertheless, protection under the business judgment rule extends to duty of loyalty claims. *See Orman v. Cullman*, 794 A.2d 5, 22 (Del. 2002).  The rule creates a presumption that the Individual Directors acted loyally in entering into the Merger Agreement.  *Id.*  To rebut this presumption and state a claim, Plaintiff must allege facts showing that a <u>majority</u> of the Individual Defendants were interested in this transaction.  Receipt of a benefit by the Individual Defendants only constitutes an "interest" if that benefit was different from and not shared with other shareholders. *See id.* at 25 n.50.

Other than a vague reference in paragraph 6 to a change of control payment to <u>one</u> of the Individual Defendants, the Complaint contains no allegations that any of the other Individual Defendants, much less a majority of them, was interested such that they suffered a disabling conflict.  Accordingly, the business judgment rule bars any claim here for a breach of the duty of loyalty.

[8] Plaintiff contends the Individual Defendants should not have approved the Merger because Switch & Data is on a growth trend and, if the Merger is consummated, the current shareholders will not be able to capitalize on that growth. (Compl. pp. 7-10).  This allegation is facially wrong because any value from Switch & Data's potential for growth and synergies will in fact result in value to Company shareholders, who will receive 80% of the Merger consideration in Equinix stock.

1986). However, this duty applies only to transactions "'in which a fundamental change of corporate control occurs or is contemplated.'" *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 46 (Del. 1994) (quoting *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del. 1989)). In a merger transaction, a change in control does not occur where control of the corporation remains, post-merger, in a large, fluid market. *Paramount*, 637 A.2d at 47. Mergers that involve primarily stock consideration of corporations that are widely held by the public do not involve a change in control. *See, e.g., In re Santa Fe Pacific Corp. Shareholder Litig.*, 669 A.2d 59, 64, 70-71 (Del. 1995).

*Santa Fe*, which involved a merger very much like the Merger here, demonstrates that the Individual Defendants had no obligation under *Revlon*. The *Santa Fe* merger involved two publicly held companies in which all of one company's stock was exchanged for 33% cash and 67% stock in the other company. *Id.* The court rejected the shareholder's contention that the directors were under *Revlon* duties. In finding the shareholder-plaintiff had failed to state a claim, the court noted that control remained in a large, fluid market and "[c]onspicuously absent from the complaint [was] a description of the stock ownership structure of [the surviving company]." *Id.* at 71 (citing *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1290 (Del. 1994)).

Like the consideration received by *Santa Fe* stockholders, Company stockholders will receive 80% stock and 20% cash, resulting in a 13% ownership interest in Equinix after the Merger. Although the Complaint fails to discuss the stock ownership structure of Equinix, it is clear from public filings that it is a large publicly-held company whose

shares are widely held by the public. *See* Proxy Statement at 101, 106. Thus, pursuant to *Santa Fe,* no *Revlon* duty applies here.

Even if the *Revlon* duty applied, the Individual Defendants maximized the Merger consideration through their active participation and effective negotiations with Equinix. Conspicuously absent from the Complaint is any reference to the fact that, throughout the course of the negotiations with Equinix, the Individual Defendants repeatedly extracted higher offers from Equinix. Nor does the Complaint mention that the final, agreed upon Merger price represented a 33.9% premium over the Company's publicly traded stock price at the time. Thus, the Complaint is devoid of any facts to suggest that the Individual Defendants could have obtained more from Equinix, and the facts that are properly before this Court demonstrate that the Individual Defendants obtained the highest possible Merger consideration.

The Complaint also fails to show that the Individual Defendants could have obtained a superior offer from the International Party or some other industry participant. In the months since merger negotiations commenced with Equinix and the Merger was publicly announced, neither the International Party, nor any other interested party has made a superior bid for the Company. This absence of any superior offer confirms the Board's judgment in September – based on its experience, knowledge of the market and advice from its financial advisors – that a superior offer was not likely to materialize from either the International Party or another industry participant. Because the Complaint is devoid of any allegation that the Board failed to inform itself of the market such that its business decision to approve the Merger with Equinix was not a well-

informed and prudent business decision, the claims in Count 2 and 3 are legally deficient.[9]

### 3.    Switch and Data Does Not Owe Any Fiduciary Duty to Its Shareholders

Count 2 and 3 should also be dismissed as to Switch and Data because it is well settled that a corporation is not a fiduciary of, and thus cannot owe, a fiduciary duty to its shareholders. *See In re Dataproducts Corp. S'holders Litig.*, Case No. 11164, 1991 WL 165301, at *6 (Del. Ch. Aug. 22, 1991). In fact, "[t]here is not and could not conceptually be any authority that a corporation as an entity has a fiduciary duty to its shareholders." *Radol v. Thomas*, 772 F.2d 244, 258 (6th Cir. 1985) ("Liability for the directors' fiduciary obligation could not possibly run against the corporation itself, for this would create the absurdity of satisfying the shareholders' claims against the directors from the corporation, which is owned by the shareholders. "); *see also Koch Refining v. Farmers Union Cent. Exhange, Inc.*, 831 F.2d 1339, 1352 (7th Cir. 1987); *Jordan v. Global Natural Resources, Inc.*, 564 F. Supp. 59, 68 (S.D. Ohio 1983). Thus, the breach of fiduciary duty claims against Switch and Data should be dismissed as a matter of law.

---

[9] The Complaint's allegations that the Individual Defendants failed to conduct a market check are likewise insufficient to salvage Plaintiff's state law claims. A market check is not a per se requirement even if the heightened *Revlon* duty applied. *See In re Wheelabrator*, 1992 WL 212595, at *9 ("[E]ven if there occurred a 'fundamental change of corporate control' that triggered *Revlon* duties under *Barkan*, the plaintiffs have not alleged that [the corporation's] directors were so uninformed about [the corporation's] value that they violated their *Revlon* duties by not conducting an active survey of the market, or 'market check'"); *Barkan v. Amsted Industries, Inc.*, 567 A.2d 1279, 1287 (Del. 1989) (when "directors possess a body of reliable information with which to evaluate the fairness of a transaction, they may approve [a] transaction without conducting an active survey of the market"). Moreover, under the business judgment rule the focus is on whether the Individual Defendants made an informed decision, not whether they conducted a market check to obtain the highest possible consideration.

**CONCLUSION**

For the foregoing reasons, Defendants Keith Olsen, William Luby, Kathleen Earley, George Kelly, Arthur Matin, G. Michael Sievert, Michael Sileck, M. Alex White and Switch and Data Facilities Company, Inc. respectfully request that the Court enter an order dismissing Plaintiff's Complaint against them.

Date: January 13, 2010

Respectfully submitted

HOLLAND & KNIGHT LLP

By: /s Louise McAlpin
Louise McAlpin (Fla. Bar No. 983810)
Mara Geronemus (Fla. Bar No. 019086)
Florida Bar No. 983810
Suite 3000
701 Brickell Avenue
Miami, FL 33131
Telephone: 305-374-8500
Facsimile: 305-789-7799

Michael L. Chapman (Fla. Bar No. 843555)
100 N. Tampa Street, Suite 4100
Post Office Box 1288
Tampa, FL 33601-1288
Telephone: 813-227-8500
Facsimile: 813-229-0134

*Attorney for Defendants Switch and Data Facilities Company, Inc., Kathleen Earley, George Kelly, William Luby, Arthur Matin, Keith Olsen, G. Michael Sievert, Michael Sileck, and M. Alex White*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 13, 2010, I electronically filed the

foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the

foregoing document is being served this day on all counsel of record via transmission of

Notices of Electronic Filing generated by CM/ECF

/s Louise McAlpin
Louise McAlpin

# 9101521_v2